## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

KEVIN M. LARGE, on behalf of plaintiff )
and the class named herein, )
                         )
           **Plaintiff,** )
      **vs.** )     **No.: 1:09-CV-689-JTN**
                         )
LVNV FUNDING LLC, RESURGENT )     **Judge Janet T. Neff**
CAPITAL SERVICES, L.P.; ALEGIS )
GROUP LLC; and PLAINS COMMERCE )
BANK, )
           **Defendants.** )

# EXHIBIT 1

Slip Copy, 2009 WL 2370713 (W.D.Mich.)
**(Cite as: 2009 WL 2370713 (W.D.Mich.))**

Only the Westlaw citation is currently available.

United States District Court,
W.D. Michigan,
Southern Division.
Kevin WILLIAMS, Plaintiff,
v.
CASS COUNTY SHERIFF DEPARTMENT et al.,
Defendants.
**No. 1:09-cv-590.**

July 30, 2009.

Kevin Williams, pro se.

**OPINION**

JANET T. NEFF, District Judge.

**\*1** This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. The Court has granted Plaintiff leave to proceed *in forma pauperis.* Under the Prison Litigation Reform Act, PUB.L. NO. 104-134, 110 STAT. 1321 (1996), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez,* 504 U.S. 25, 33, 112 S.Ct. 1728, 118 L.Ed.2d 340 (1992). Applying these standards, Plaintiff's action will be dismissed for failure to state a claim.

**Discussion**

I. *Factual allegations*

Plaintiff's complaint concerns the conditions of his confinement at the Cass County Jail. In his *pro se* complaint, he sues the Cass County Sheriff Department; Sheriff Joseph Underwood; Under Sheriff Richard Behnke; Captain (unknown) Affressio; Sergeant K. Garretts; Sergeant W. Gless; Officer (unknown) Giding; Sergeant (unknown) Johnson; and Officers M. Bradly, S. Pollock, (unknown) Shoup, (unknown) Affressio, (unknown) Appoloni, (unknown) Jackson, (unknown) McCoy, (unknown) Torbert.

Plaintiff has been incarcerated in the Cass County Jail since February 2009. In Claim I, Plaintiff asserts that he is not being provided with proper medical treatment at the Jail. Plaintiff does not explain his medical condition(s) other than to allege that he has high blood pressure and "stage 3 kidney failure because of the Defendant(s) interference." (Compl., 1, docket # 1-3.) Plaintiff further claims that since his arrival at the Jail, Officers Gidings, Bradly, Pollock, McCoy, Shoup, Affressio, Jackson and Appoloni have distributed his medications in an untimely manner. He also alleges that the officers never wore gloves while handling the medication and if there was anything wrong with the medication, the Officers told Plaintiff to kite the nurse. Plaintiff claims that he sent numerous kites and filed grievances concerning the lack of medical care, but no corrective action was taken.

In Claim II, Plaintiff alleges that on March 2, 2009, he made requests to Captain Affressio and Sheriff Underwood for an emergency call button inside of his cell. Plaintiff claims that an emergency call button was necessary due to his medical condition and frequent medical emergencies, e.g., "high blood pressure, wrong meds and dosages and not getting all of my medications, shaking, sweating, dizziness, white lights in eyes and passing out." (Compl.,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2370713 (W.D.Mich.)
(Cite as: 2009 WL 2370713 (W.D.Mich.))

docket # 1-3, at 7.) After waiting a month with no response, Plaintiff filed a grievance on April 5, 2009, claiming that he needed an emergency call button because he suffers from severe high blood pressure. (*See* 4/5/09 Grievance Form, docket # 1-4, at 13.) On April 22, 2004, Plaintiff was moved to a different cell with an emergency call button. Plaintiff alleges that Defendants failed to inform him that he was being moved to A-Block, which he refers to as "the hole." According to Plaintiff, he was moved to A-Block from a cell in B-Block where there was a table, television, shower and no bright lights shining in his eyes 24 hours a day. Plaintiff contends that being moved to a worse cell block was a form of punishment.

*2 Plaintiff alleges in Claim III that while he was incarcerated in B-Block, he was placed in a cell with ants. Plaintiff alleges that Officers Gidings, Shoup and Appoloni forced him into the cell even after Plaintiff pointed out the ants on the floor. The officers had the floor cleaned with bleach water to kill the ants, but they came back the same day. Plaintiff requested a grievance form, complaining that the ants were crawling on him and biting him. (*See* 3/2/09 Inmate Request Form, docket # 1-4, at 15.) Plaintiff subsequently filed a grievance on April 5, 2009. On the morning of April 22, 2009, the same day that Plaintiff was moved to A-Block, an exterminator sprayed Plaintiff's cell.

## II. *Failure to state a claim*

A complaint may be dismissed for failure to state a claim if " 'it fails to give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly,* 550 U.S. at 555; *Ash-*

*croft v. Iqbal,* ---U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570.

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *Street v. Corr. Corp. of Am.,* 102 F.3d 810, 814 (6th Cir.1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver,* 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994).

## A. **Denial of Medical Care**

The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes. U.S. Const. amend. VIII. The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble,* 429 U.S. 102, 103-04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104-05; *Comstock v. McCrary,* 273 F.3d 693, 702 (6th Cir.2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2370713 (W.D.Mich.)

**(Cite as: 2009 WL 2370713 (W.D.Mich.))**

other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo County,* 390 F.3d 890, 899 (6th Cir.2004). If, however the need involves "minor maladies or non-obvious complaints of a serious need for medical care," *Blackmore,* 390 F.3d at 898, the inmate must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Napier v. Madison County, Ky.,* 238 F.3d 739, 742 (6th Cir.2001).

**\*3** The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery,* 207 F.3d 863, 867 (6th Cir.2000) (citing *Farmer,* 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer,* 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* Under *Farmer,* "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Plaintiff broadly asserts that he is being denied medical treatment at the Cass County Jail, but provides little factual support for his claim other than his conclusory allegation that he has high blood pressure and "stage 3 kidney failure because of the Defendant(s) interference." (Compl., 1, docket # 1-3.) Assuming Plaintiff can satisfy the objective component for an Eighth Amendment claim, he cannot satisfy the subjective component. None of the named Defendants are medical personnel and Plaintiff does not specifically allege how any of the Defendants have denied him necessary medical treatment other than his allegations that Officers

Gidings, Bradly, Pollock, McCoy, Shoup, Affressio, Jackson and Appoloni distributed his medications in an untimely manner.

While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly,* 550 U.S. at 555. The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570. The court need not accept "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements ...." *Ashcroft v. Iqbal,* --- U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show [n]'-that the pleader is entitled to relief." *Ashcroft,* 129 S.Ct. at 1950 (quoting FED. R. CIV. P. 8(a)(2)). With the exception of his claim regarding the untimely delivery of his medications, which is discussed below, Plaintiff fails to allege sufficient facts to state a plausible claim for relief against any of the named Defendants for denial of medical treatment.

Plaintiff claims that Officers Gidings, Bradly, Pollock, McCoy, Shoup, Affressio, Jackson and Appoloni distributed his medications in an untimely manner. He further alleges that the Officers never wore gloves while handling the medication and if there was anything wrong with the medication, they told Plaintiff to kite the nurse. While Plaintiff generally asserts that the medications were delivered in an untimely manner, he does not allege how often his medications were late, how late they were delivered or that he suffered any adverse effects as a result of the alleged untimely delivery. Likewise, Plaintiff does not allege how the Officers' failure to wear gloves while handling the medication created

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2370713 (W.D.Mich.)

**(Cite as: 2009 WL 2370713 (W.D.Mich.))**

a substantial risk of serious harm. Moreover, instructing Plaintiff to contact nursing staff if he had questions regarding his medication did not constitute deliberate indifference, as the Defendant Officers were not qualified medical personnel. Accordingly, Plaintiff fails to state an Eighth Amendment claim arising from the alleged denial of medical treatment.

**B. Emergency Call Button**

**\*4** Plaintiff also claims that he was placed in a cell without an emergency call button. He contends that an emergency call button was necessary due to his medical condition and frequent medical emergencies. The failure to provide an emergency call button, standing alone, does not constitute deliberate indifference. *See Parsons v. Wilkinson,* No. 97-3011, 1998 WL 791810, at \*2 (6th Cir. Nov.4, 1998). In this case, Plaintiff does not allege any specific instance in which he was unable to summon help during a medical emergency. Moreover, Plaintiff was moved to a cell with an emergency call button on April 22, 2004, seventeen days after he filed his grievance. Plaintiff has not alleged facts showing that any of the named Defendants knew of and disregarded an excessive risk to his health or safety. *See Farmer,* 511 U.S. at 837. Because the facts as alleged do not satisfy the subjective component of an Eighth Amendment claim, Plaintiff fails to state a claim arising from his placement in a cell without an emergency call button.

Plaintiff complains that Defendants failed to inform him that he was being moved to "the hole." According to Plaintiff, he was moved to A-Block from a cell in B-Block where there was a table, television, shower and no bright lights shining in his eyes 24 hours a day. Plaintiff contends that being moved to a worse cell block was a form of punishment. The Eighth Amendment prohibits punishments that are not only physically barbaric, but also those which are incompatible with "the evolving standards of

decency that mark the progress of a maturing society," or which "involve the unnecessary and wanton infliction of pain." *Estelle v. Gamble,* 429 U.S. 97, 102-103, 97 S.Ct. 285, 50 L.Ed.2d 251(1976). To establish an Eighth Amendment claim, the prisoner must show that he was deprived of the "minimal civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Restrictions that are restrictive or even harsh, but are not cruel and unusual under contemporary standards, are not unconstitutional. *Id.* Thus, federal courts may not intervene to remedy conditions that are merely unpleasant or undesirable.

First, Plaintiff asked to be placed in a cell with an emergency call button. Second, although it is clear that Plaintiff was denied certain privileges and amenities as a result of his placement in A-Block, he does not allege or show that he was denied basic human needs and requirements. The Sixth Circuit has held that without a showing that basic human needs were not met, the denial of privileges as a result of administrative segregation cannot establish an Eighth Amendment violation. *See Bradley v. Evans,* No. 98-5861, 2000 WL 1277229, at \*8 (6th Cir. Aug.23, 2000), *cert. denied,* 531 U.S. 1023, 121 S.Ct. 592, 148 L.Ed.2d 506 (2000); *Collmar v. Wilkinson,* No. 97-4374, 1999 WL 623708, at \*3 (6th Cir. Aug.11, 1999). Moreover, Plaintiff cannot not bring an Eighth Amendment claim for emotional or mental damages because he does not allege a physical injury from his placement in A-Block. *See* 42 U.S.C. § 1997e(e); *see also Hudson,* 503 U.S. at 5; *Watson v. McClanahan,* No. 99-6124, 2000 WL 922899, at \*2 (6th Cir. June 27, 2000); *Benson v. Carlton,* No. 99-6433, 2000 WL 1175609, at \*1 (6th Cir. Aug.9, 2000). As such, Plaintiff fails to state an Eighth Amendment claim arising from his placement in A-Block.

**\*5** To the extent Plaintiff's allegations suggest that Defendants retaliated against him for complaining and filing grievances by moving him to a less desir-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2370713 (W.D.Mich.)

**(Cite as: 2009 WL 2370713 (W.D.Mich.))**

able cell in A-Block, he also fails to state a claim. Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter,* 175 F.3d 378, 394 (6th Cir.1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Thaddeus-X,* 175 F.3d at 394. Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell,* 250 F.3d 1032, 1037 (6th Cir.2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

Even assuming Plaintiff could satisfy the first two requirements for a retaliation claim, he fails to allege sufficient facts from which the Court can draw a reasonable inference that the alleged adverse action was motivated by Plaintiff's complaints or grievances. *Ashcroft,* 129 S.Ct. at 1949. Plaintiff does not dispute that his move to A-Block resolved his complaint that his cell in B-Block had ants and his request for a cell with an emergency call button. Thus, Plaintiff was moved to resolve his grievances, not to punish him for filing grievances. Moreover, "conclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state ... a claim under § 1983.' " *Harbin-Bey,* 420 F.3d at 580 (quoting *Gutierrez v. Lynch,* 826 F.2d 1534, 1538-39 (6th Cir.1987)); *see also Skinner v. Bolden,* 89 F. App'x 579, 579-80 (6th Cir.2004) (without more, conclusory allegations of temporal proximity are not sufficient to show a retaliatory motive); *Birdo v. Lewis,* No. 95-5693, 1996 WL 132148, at *1 (6th Cir. Mar.21, 1996); *Fields v. Powell,* No. 94-1674, 1995 WL 35628, at *2 (6th Cir. Jan.30, 1995); *Williams v.*

*Bates,* No. 93-2045, 1994 WL 677670, at *3 (6th Cir. Dec.2, 1994). Plaintiff has not presented any facts to support his conclusion that Defendants retaliated against him because he complained or filed grievances. Accordingly, he fails to state a claim for retaliation.

## C. Ants

Finally, Plaintiff claims that he was placed in a cell that was infested with ants. Plaintiff does not allege the date that he was moved into the cell, but he requested a grievance form on March 2, 2009. Plaintiff filed a grievance on April 5 and was moved out of the cell on April 22, 2009. The exterminator sprayed the cell the same day that Plaintiff moved out. Ostensibly, a prisoner could not be in the cell when it was sprayed with insecticide. While unpleasant, the alleged conditions were not below the constitutional standard of "the minimal civilized measures of life's necessities." *See Rhoades,* 452 U.S. at 347; *see also Sanders v. Smith,* 1993 WL 94077, at *1 (6th Cir.1993) (prisoner's six-day stay in a segregation cell that did not have hot water or adequate ventilation and was infested with roaches did not violate the Eighth Amendment); *Brown v. Withrow,* 1993 WL 15141, at *1 (6th Cir. Jan.22, 1993) (prisoner's four-day stay in a detention cell that did not have adequate bedding or hot water and was infested with rats, roaches and ants did not violate the Eighth Amendment); *Wilson v. Schomig,* 863 F.Supp. 789, 794-95 (N.D.Ill.1994) (allegations that the plaintiff's "cell contained dirt, dust and roaches, and that his ceiling leaked during rainstorms" are "not sufficiently serious" to violate the Eighth Amendment). Moreover, Plaintiff was moved to another cell seventeen days after he filed his grievance and the cell was treated by an exterminator. Consequently, Plaintiff cannot show that Defendants disregarded an excessive risk to his health or safety.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2370713 (W.D.Mich.)
**(Cite as: 2009 WL 2370713 (W.D.Mich.))**

### *Conclusion*

**\*6** Having conducted the review now required by the Prison Litigation Reform Act, the Court determines that Plaintiff's action will be dismissed for failure to state a claim pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).

The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore,* 114 F.3d at 611. For the same reasons that the Court dismisses the action, the Court discerns no good-faith basis for an appeal. Should Plaintiff appeal this decision, the Court will assess the $455.00 appellate filing fee pursuant to § 1915(b) (1), *see McGore,* 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis,* e.g., by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $455.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A Judgment consistent with this Opinion will be entered.

W.D.Mich.,2009.
Williams v. Cass County Sheriff Dept.
Slip Copy, 2009 WL 2370713 (W.D.Mich.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1182863 (N.D.Ohio)
**(Cite as: 2000 WL 1182863 (N.D.Ohio))**

H

Only the Westlaw citation is currently available.

United States District Court, N.D. Ohio, Western Division.
Leonard E. FRALEY, Plaintiff,
v.
OCWEN FEDERAL BANK FSB, Defendant.
**No. 3:99CV7748.**

June 1, 2000.

Leonard E. Fraley, Toledo, OH, pla represented by Fraley, pro se.

Rosemary Taft Milby, Weltman, Weinberg & Reis, Cleveland, OH, dft represented by Milby.

Colleen A. Mountcastle, Weltman, Weinberg & Reis, Cleveland, OH, dft represented by Mountcastle.

ORDER

CARR

*1 This is a *pro se* suit under the Federal Truth in Lending Act (TLA), in which plaintiff claims that defendant, Ocwen Federal Bank (Ocwen), violated his right to cancel his loan contract with Decision One Mortgage Company, LLC (Decision One). Pending is Ocwen's motion for summary judgment. (Doc. 9). For the following reasons, Ocwen's motion shall be granted.

BACKGROUND

On March 26, 1998, plaintiff Leonard Fraley and his wife borrowed $24,800 from Decision One and secured this debt with a mortgage on their home. Plaintiff's home is a principal dwelling under the TLA. Consequently, Decision One was obligated to comply with the TLA's disclosure requirements; failure to do so could give rise to plaintiff's right to cancel the loan contract.

Plaintiff claims he rightfully cancelled the loan contract with Decision One on May 6, 1998, because he did not receive the required disclosures. Decision One believes that the above cancellation was time-barred and thus the loan contract continues to remain in force.

Decision One assigned responsibility for loan payment collection to Ocwen in a Residential Flow Servicing Agreement dated March 1, 1998. (*See* Doc. 14 at Exhibit A). The Servicing Agreement detailed Ocwen's rights and duties regarding collection from Decision One's many debtors.

Decision One informed plaintiff of this assignment by letter dated June 3, 1998, and requested that plaintiff make his future payments to Ocwen. In a second letter dated June 19, 1998, Ocwen reconfirmed the assignment.

On May 3, 1999, plaintiff wrote to Ocwen and inquired about Ocwen's rights over his loan from Decision One. (*See* Doc. 14 at Ex. F). Ocwen responded to plaintiff on May 21, 1999, explaining that it did not own plaintiff's loan but only serviced it. (*See* Doc. 14 at Ex. G).

Plaintiff failed to make any loan payments to Ocwen after the assignment. Thus, Ocwen served plaintiff with a notice of default in January 1999.

Prior to the notice, Ocwen took out insurance on plaintiff's home. Pursuant to section 2.3(d) of the Servicing Agreement with Decision One, Ocwen had the right to obtain such insurance on the mortgage assets of Decision One's debtors, including plaintiff.

Plaintiff argues that this insurance shows that

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp.2d, 2000 WL 1182863 (N.D.Ohio)
**(Cite as: 2000 WL 1182863 (N.D.Ohio))**

Ocwen is the real owner of his loan. Thus plaintiff filed a *pro se* complaint in this Court, seeking damages because Ocwen did not honor his request that his loan be cancelled. Ocwen timely answered and asserted five affirmative defenses, the fifth of which is that Ocwen never owned the loan and thus can not be held liable for failure to make the disclosures required by the TLA. Ocwen now moves for summary judgment on its fifth affirmative defense.

## STANDARD OF REVIEW

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U .S. 317, 322 (1986). The moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the non-moving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quoting Fed.R.Civ.P. 56(e)).

*2 Once the burden of production shifts, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is insufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Rather, Rule 56(e) "requires the non-moving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex,* 477 U .S. at 324.

In deciding a motion for summary judgment, the evidence of the non-moving party will be believed as true, all doubts will be resolved against the moving party, all evidence will be construed in the light most favorable to the non-moving party, and all reasonable inferences will be drawn in the non-moving party's favor. *Eastman Kodak Co. v. Technical Services, Inc.,* 504 U.S. 451, 456 (1992). Summary judgment shall be rendered only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed R.Civ.P. 56(c).

Plaintiff is proceeding *pro se,* and thus his pleadings are more liberally construed than those prepared by an attorney. *Haires v. Kerner,* 404 U.S. 519, 520-21 (1972); *Hahn v. Star Bank,* 190 F.3d 708, 715 (6th Cir.1999). While courts must apply "less stringent standards" in determining whether *pro se* pleadings make a claim for which relief can be granted. *Pilgrin v.. Littlefield,* 92 F.3d 413, 416 (6th Cir.1996), *pro se* plaintiffs are not automatically entitled to take every case to trial. As the Sixth Circuit has noted, the lenient treatment generally accorded to *pro se* litigants has limits. *Jordan v. Jabe,* 951 F.2d 108, 110 (6th Cir.1991)

## DISCUSSION

Plaintiff contends that Ocwen violated the Federal Truth in Lending Act, codified at 15 U.S.C. § 1601 *et seq.,* because certain required disclosures were not made. I disagree.

The parties to the loan contract are plaintiff and Decision One. Ocwen is and never has been a party to this contract. Though Decision One assigned Ocwen certain loan responsibilities, ownership of plaintiff's loan never changed hands. Accordingly, plaintiff is not entitled to relief from Ocwen. In other words, Ocwen can not be held liable for Decision One's alleged failure to provide the required disclosures under the TLA.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1182863 (N.D.Ohio)

**(Cite as: 2000 WL 1182863 (N.D.Ohio))**

Plaintiff counters that Ocwen's purchase of insurance on his home demonstrates that Ocwen owned the loan. This argument has no merit. Such insurance merely reflects Ocwen's assignment of rights pursuant to the Servicing Agreement with Decision One. The act of acquiring insurance cannot alter the underlying relationship between Ocwen and the original lender, Decision One, which expressly retained ownership of the mortgage.

CONCLUSION

**\*3** It is, therefore,

ORDERED THAT defendant's motion for summary judgment shall be granted. Further, the court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could be taken in good faith.

So ordered.

N.D.Ohio,2000.
Fraley v. Ocwen Federal Bank FSB
Not Reported in F.Supp.2d, 2000 WL 1182863 (N.D.Ohio)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 350847 (N.D.Ill.)
**(Cite as: 1999 WL 350847 (N.D.Ill.))**

▷
Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern
Division.
Shelly D. SWIFT, individually and on behalf of all
others similarly situated, Plaintiff,
v.
FIRST USA BANK, First Credit Card Services
USA, and Premiere Communications, Inc., Defend-
ants.
**No. 98 C 8238.**

May 21, 1999.

*MEMORANDUM OPINION*

KOCORAS, J.

**\*1** This matter is before the Court on a motion to
dismiss brought by defendants First USA Bank
("First USA"), First Credit Card Services USA
("First Credit"), and Premiere Communications,
Inc. ("Premiere") (collectively "Defendants"). For
the following reasons, the motion is granted in part
and denied in part.

BACKGROUND

Plaintiff Shelley D. Swift filed a class action com-
plaint against Defendants alleging violations of the
Truth in Lending Act, 15 U.S.C. § 1642 ("TILA");
the Illinois Consumer Fraud and Deceptive Trade
Practices Act, 815 ILCS 505/1 et seq. ("ICFA");
and the Illinois Uniform Deceptive Trade Practices
Act, 815 ILCS 510/1 et seq. ("DTPA") Swift seeks
actual, statutory, and punitive damages, as well as
injunctive relief.

The complaint contains the following allegations.
First USA is a bank which issues credit cards to
consumers throughout the United States. First Cred-

it provides marketing services and credit card servi-
cing to credit card issuers such as First USA.
Premiere is a telecommunications company that
provides telephone services to consumers nation-
wide.

In January 1998, Swift received a credit card soli-
citation from Defendants in the mail. The cover let-
ter discussed the benefits of the Platinum Connect
card ("Connect Card"), which was enclosed with
the letter. The letter stated:

Introducing the First USA Platinum Connect card.

Whether you decide to use it as a calling card, a
Pre-Approved credit card, or both, you'll receive
one free hour of long distance calling.

\* \* \*

Use your new Platinum Connect card to make all
your calls AND purchases. Having one card for
both your calling and credit card needs is a great
convenience. Because not only is it one card to
carry, it is also just one bill to pay every month.

\* \* \*

You're Pre-Approved!

Just call 1(800) 335-2453 to activate your card
today. Activating your card is simple, since
you're already Pre-Approved. Just call 1(800)
335-2453 by January 30, 1998, to get your free
hour of domestic long distance calling, and if you
choose, to take advantage of the credit card and/
or calling card features.

The card member agreement further disclosed that
Premiere would provide telecommunications ser-
vices in conjunction with the credit card.

Included with the solicitation was a VISA credit
card which could be activated by calling an 800

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 350847 (N.D.Ill.)

**(Cite as: 1999 WL 350847 (N.D.Ill.))**

number. Swift had not applied or otherwise requested a credit card from Defendants prior to receiving Defendants' solicitation in the mail, and Swift had never been a customer of Defendants.

## LEGAL STANDARD

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the sufficiency of the complaint, not to decide the merits of the case. Defendants must meet a high standard in order to have a complaint dismissed for failure to state a claim upon which relief may be granted. In ruling on a motion to dismiss, the court must construe the complaint's allegations in the light most favorable to the plaintiff and all well-pleaded facts and allegations in the plaintiff's complaint must be taken as true. *See Bontkowski v. First National Bank of Cicero,* 998 F.2d 459, 461 (7th Cir.1993). The allegations of a complaint should not be dismissed for failure to state a claim "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *see also Hartford Fire Insurance Co. v. California,* 509 U.S. 764 (1993); *Sherwin Manor Nursing Center, Inc. v. McAuliffe,* 37 F.3d 1216, 1219 (7th Cir.1994). Nonetheless, in order to withstand a motion to dismiss, a complaint must allege facts sufficiently setting forth the essential elements of the cause of action. *See Lucien v. Preiner,* 967 F.2d 1166, 1168 (7th Cir.1992).

**\*2** In reviewing a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court is limited to the allegations contained in the pleadings themselves. Documents incorporated by reference into the pleadings and documents attached to the pleadings as exhibits are considered part of the pleadings for all purposes. *See* Fed.R .Civ.P. 10(c). In addition, "[d]ocuments that a defendant attaches to a motion to dismiss are considered a part of the pleadings if they are referred to in the plaintiff's

complaint and are central to her claim." *Venture Associates Corp. v. Zenith Data Systems Corp.,* 987 F.2d 429, 431 (7th Cir.1993). It is with these principles in mind that we turn to the motion before us.

## DISCUSSION

### I. TILA claims

Section 1642 of TILA provides that "no credit card shall be issued except in response to a request or application therefor." 15 U.S.C. § 1642. Credit Card is defined as "any card, plate, coupon book or other credit device existing for the purpose of obtaining money, property, labor or service on credit." *Id.* § 1602(k). Regulation Z, drafted by the Federal Reserve Board pursuant to statutory authority, provides that "[r]egardless of the purpose for which the credit card is to be used ... no credit card shall be issued to any person except (1) In response to an oral or written request or application for the card; or (2) As a renewal of, or substitute for, an accepted credit card."

### A. The Federal Reserve Board's Revised Commentary

On March 31, 1999, just a week before this Court was originally set to rule on the instant motion, the Federal Reserve Board issued revisions to its Official Commentary to Regulation Z. These revisions explicitly prohibit the activities engaged in by First USA by including among the definition of credit card "[a] card or device that can be activated upon receipt to access credit, even if the card has a substantive use other than credit.... Such a card or device is a credit card notwithstanding the fact that the recipient must first contact the card issuer to access or activate the credit feature." Commentary to Regulation Z, 64 Fed.Reg. 16614 (1999). Included in the supplementary information printed in the federal register along with the revised commentary is

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 350847 (N.D.Ill.)

**(Cite as: 1999 WL 350847 (N.D.Ill.))**

the following statement: "To the extent that the interpretation of the TILA rule previously may have been unclear, the Board believes that liability should not attach to a card issuer's prior reliance on comment 12(a)(1)-7." *Id.* The Court ordered supplemental briefing so the parties could have an opportunity to address the effect of these revisions on the present action.

Defendants' in their supplemental briefing argued only that the revisions should not be applied retroactively.[FN1] *See* Defendants' Supplemental Memorandum at 2. Plaintiffs argue that the motion to dismiss should be denied and that the amendments should not be applied retroactively. Plaintiffs' Response to Supplemental Motion at 2. This Court need not address whether the revisions should be given retroactive application, *see First National Bank of Chicago v. Standard Bank & Trust,* - F.3d -, 1999 WL 166920 at * 6 (7th Cir.1999)(citing *Pope v. Shalala,* 998 F.2d 473, 483 (7th Cir.1993)), because, as will be discussed below, First USA's alleged activities were prohibited even under the prior commentary.

> FN1. Defendants did not argue that the FRB's statement that "the Board believes that liability should not attach to a card issuer's prior reliance on comment 12(a)(1)-7" was an official interpretation-independent of whether the revisions should be applied retroactively-to which the Court must give deference under *Ford Motor Credit Company v. Milhollin,* 444 U.S. 555 (1980).

**B. The Federal Reserve Board's Prior Commentary**

**\*3** The prior Federal Reserve Board's Official Staff Commentary on Regulation Z Truth in Lending ("Official FRB Commentary") permitted the issuance of unsolicited devices that are not credit cards:

7. Issuance of non-credit cards. The issuance of an unsolicited device that is not, but may become, a credit card, is not prohibited provided:

* the device has some substantive purpose other than obtaining credit, such as access to non-credit services offered by the issuer;

* it cannot be used as a credit card when issued; and

* a credit capability may be added only on the recipient's request.

For example, the card issuer could send a check guarantee card on an unsolicited basis, but could not add a credit feature to that card without the consumer's specific request. The reencoding of a debit card or other existing card that had no credit privileges when issued would be appropriate after the consumer has specifically requested a card with credit privileges. Similarly, the card issuer may add a credit feature, for example, by reprogramming the issuer's computer program or automated teller machines, or by a similar program adjustment.

Official FRB Commentary § 226.12(a)(1)-7. Such Official FRB Commentary has the status of a regulation. *See Benion v. Bank One, Dayton, N.A.,* 144 F.3d 1056, 1058 (7th Cir.1998).

Defendants claim that the mailing of the Connect Card to Swift did not violate the TILA because 1) the solicitation complies with Official FRB Commentary, and 2) an affirmative act-i.e. a request by Swift to add the credit card feature-is required before the card would have any credit card functionality. According to Defendants, consistent with the Official FRB Commentary, the card has two separate substantive purposes other than obtaining credit. First, it is a calling card which can be billed to any credit or debit card. Second, the card has a rewards feature that entitled the consumer to a 10% rebate on all calling card calls. The calling card feature can be activated without activating the credit feature.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 350847 (N.D.Ill.)

**(Cite as: 1999 WL 350847 (N.D.Ill.))**

Additionally, argue the Defendants, the Connect Card has no present credit card functionality because the recipient has to call up to activate the card. The consumer has to dial an 800 number in order for the card to become a credit card. The card may be used as a telephone card without ever adding the credit feature, although a customer would similarly have to activate the calling card feature by dialing the same 800 number.

Plaintiff argues that "if something looks like a duck, walks like a duck, and quacks like a duck, then it is a duck ... Defendants attempt to call their duck a phone." Response at 5, fn. 2. A credit card has already been issued, according to Swift, and the only thing the recipient must do is activate the card. Issuance and activation are conceptually distinct.

Defendants' arguments are wholly unpersuasive. The core of their argument is best described in First USA's reply, which claims that "it is irrelevant whether the call to add the credit feature is considered an application for credit or an acceptance of a pre-approved offer of credit because under the FRB Commentary the key issue is not whether the consumer applied for the credit card or if the credit was extended pursuant to a pre-approved offer, but whether the credit capability is added on the recipient's request." First USA's Reply at 7. Stripped down to the bones, Defendants argue that so long as the consumer must call to activate the card, TILA § 1642 does not apply.

**\*4** If this Court were to accept Defendants' argument, nothing would be left of § 1642. As experience demonstrates, credit cards sent in the mail must be activated before use. This is true whether the card is on a new (hopefully solicited) account or a replacement card. Semantics aside, Swift alleges that Defendants issued and mailed her a credit card without her request. This would be a violation of TILA.

Defendants' arguments regarding the Official FRB

Commentary on unsolicited non-credit card devices are insufficient for the same reasons. The Commentary requires that the device cannot be used as a credit card when issued. The Defendants must therefore argue again that the activation phone call is the crucial step to distinguish their Connect Card from a mere unsolicited credit card. For the reasons outlined above, these arguments are unpersuasive.

Defendants First Credit and Premiere claim that they are not subject to TILA liability because they are not creditors as defined by TILA. TILA imposes liability only on "any creditor who fails to comply with any requirement." 15 U.S.C. § 1640. Creditor is defined as follows:

The term "creditor" refers to a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement. Notwithstanding the preceding sentence, in the case of an open-end credit plan involving a credit card, the card issuer and any person who honors the credit card and offers a discount which is a finance charge are creditors.

15 U.S.C. § 1602(f).

Swift alleges that First Credit provides marketing services and credit card servicing to credit card issuers such as First USA and that Premiere is a telecommunications company that provides telephone services to consumers nationwide. Swift does not allege that either First Credit or Premiere "extends ... consumer credit" or is "the person to whom the debt ... is initially payable," nor does it allege that either "offers a discount which is a finance charge."

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 350847 (N.D.Ill.)

**(Cite as: 1999 WL 350847 (N.D.Ill.))**

They are therefore not subject to TILA liability, and their motions to dismiss the TILA claim against them are granted. First USA's motion to dismiss the TILA claim is denied.

## II. ICFA and DTPA claims

Defendants move to dismiss Count II of Swift's complaint, which alleges a cause of action under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq. and seeks damages for violations of the ICFA and the DTPA, including punitive damages.

The ICFA, in pertinent part, provides that

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with the intent that others rely upon the concealment, suppression or omission of such material fact, or of the use or employment of any practice described in [the Illinois Uniform Deceptive Trade Practices Act, 810 ILCS 510/2 et. seq.] in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been mislead, deceived, or damaged thereby.

**\*5** 815 ILCS 505/2. Anyone who is damaged as a result of a violation of the ICFA is allowed to bring an action against the alleged violator. 815 ILCS 505/10a.

In asserting a claim under the ICFA, a violation based on misrepresentation or fraud "must be plead with the particularity of Rule 9(b) of the Federal Rules of Civil Procedure." *Appraisers Coalition v. Appraisal Institute,* 845 F.Supp. 592, 608-09 (N.D.Ill.1994); *see also Ramson v. Layne,* 668 F.Supp. 1162, 1170 (N.D.Ill.1987). In order to state a cause of action under the ICFA, therefore, "a

complaint must set forth specific facts that show (1) a deceptive act or practice; (2) an intent by the defendant that the plaintiff rely on the deception; and (3) that the deception occurred in the course of conduct involving trade or commerce." *Perona v. Volkswagen of America, Inc.,* 658 N.E.2d 1349, 1352 (Ill.App.1995) (citing *People ex rel Hartigan v. E & E Hauling, Inc.,* 607 N.E.2d 165 (Ill.1992)); *see also Martin v. Heinold Commodities, Inc.,* 643 N.E.2d 734, 754 (Ill.1994) (same); *Siegel v. Levy Organization Development Co., Inc.,* 607 N.E.2d 194, 198 (Ill.1992) (same); *Adler v. William Blair & Co.,* 648 N .E.2d 226, 233 (Ill.App.1995). A plaintiff must "at least plead with sufficient particularity facts establishing the elements of fraud, including what misrepresentations were made, when they were made, who made the representations and to whom they were made." *Perona,* 658 N.E.2d at 1352 (citing *Board of Education of City of Chicago v. A. C & S, Inc.,* 546 N.E.2d 580, 594 (Ill.1989)). To state a claim under the ICFA, the plaintiff must establish that the defendant made a misrepresentation of material fact. *See Graphic Sales v. Sperry Univac,* 824 F.2d 576, 580 (7th Cir.1987).

Although disfavored, punitive damages are recoverable "where the alleged misconduct is outrageous either because the acts are done with malice or an evil motive or because they are performed with a reckless indifference toward the rights of others." *Smith v. Prime Cable of Chicago,* 658 N.E.2d 1325, 1336-37 (Ill.App.Ct.1995) (internal citations omitted).

Section 2 of the DTPA spells out twelve particular types of deceptive trade practices. The DTPA "is intended to deal with conduct involving either misleading trade identification of false or deceptive advertising" and is "directed towards unfair competition and acts which unreasonably interfere with another's conduct of his business." *Indus. Specialty Chem. v. Cummins Engine Co.,* 902 F.Supp. 805, 813 (N.D.Ill.1995) (internal citations omitted).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 350847 (N.D.Ill.)

**(Cite as: 1999 WL 350847 (N.D.Ill.))**

Swift alleges Defendants violated the ICFA and DTPA by

a. mailing credit cards to Plaintiff ... in violation of 15 U.S.C. § 1642;

b. misrepresenting the nature of the First USA Platinum Connect credit card by bundling the credit card offer with a telephone credit card;

c. using the telephone aspects of the credit card as an attempt to circumvent the requirements of 15 U.S.C. § 1642; and

*6 d. tying the acceptance of the telephone card aspect of the credit card to payment via a VISA card, which defendants were simultaneously offering to Plaintiff.

Complaint at ¶ 25.

It appears from Swift's Consolidated Response that the gravamen of the ICFA and DTPA complaint is that the solicitation attempted to "lure customers into activating the credit card feature." Further, Defendants sought to "misrepresent[ ] the true nature of the card." Finally, Swift argues that a violation of the TILA automatically amounts to a violation of the ICFA and DTPA.

Swift has failed to allege violations of the ICFA or DTPA. First, Swift has not met the heightened pleading requirements. Swift fails to articulate with specificity exactly which statements confuse or mislead, and which defendants made those statements. Swift has also failed to plead with specificity what damages were suffered. *See Dwyer v. American Express Co.,* 652 N.E.2d 1351, 1357 (requiring plaintiff to allege facts which support damages in excess of "a surfeit of unwanted mail"). A conclusory allegation of damages is insufficient without more factual predicate.

Second, Swift's argument that a TILA violation automatically gives rise to ICFA or DTPA viola-

tions is unsupported in both law and logic. Based on a case which says no such thing, Swift argues that "more egregious conduct is required to violate the ICFA and the DTPA than is required to violate the TILA. As such, a proven TILA violation would necessarily be an ICFA and DTPA violation despite absence of actual damages." Consolidated Response at 8. To begin with, this argument is logically unsound. Moreover, the ICFA specifically requires that a private party who brings an action under it must be a "person who suffers damage as a result of a violation." 815 ILCS 505/10a. Damages have consistently been a required element. *See Duran v. Leslie Oldsmobile, Inc.,* 594 N.E.2d 1355, 1361-63 (Ill.App.Ct.1992). Swift cannot escape the damages element therefore by alleging a TILA violation.

For these reasons, Count II of Swift's complaint is dismissed.

### III. Damages under the DTPA

Count III of Swift's complaint seeks punitive damages under the DTPA. While damages for violations of the DTPA may be recovered under the ICFA, just as Swift attempts in Count II, Count III seeks damages directly through the DTPA. The DTPA provides for injunctive relief only. *See* 815 ILCS 510/3; *see also Bingham v. Inter-Track Partners,* 600 N.E.2d 70, 74 (Ill.App.Ct.1992); *Dorr-Oliver Inc. v. Fluid-Quip, Inc.,* 834 F.Supp. 1008 (N.D.Ill.1993).

Count III is therefore dismissed.

### IV. Injunctive Relief

Swift's Count IV seeks injunctive relief under the ICFA and the DTPA. No relief is available to Swift. The DTPA requires that only a person "likely to be damaged" may be granted injunctive relief. 815 ILCS 510/3. As discussed above, the ICFA requires

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 350847 (N.D.Ill.)

**(Cite as: 1999 WL 350847 (N.D.Ill.))**

a showing of damages, which Swift has not properly alleged, and injunctive relief requires an additional showing of the potential for future damages. *See Smith v. Prime Cable of Chicago,* 658 N.E.2d 1325, 1327 (Ill.App.Ct.1995).

**\*7** Swift has failed to sufficiently allege potential future damages. In consumer actions under the DTPA, injunctive relief is rare because in most cases the harm has already occurred. *See id.*

Count IV of Swift's complaint is therefore dismissed.

### CONCLUSION

For the foregoing reasons, the motion to dismiss is DENIED with respect to Count I's claim against First USA, and is GRANTED with respect to all other claims and counts.

N.D.Ill.,1999.
Swift v. First USA Bank
Not Reported in F.Supp.2d, 1999 WL 350847 (N.D.Ill.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 127303 (N.D.Ill.)
**(Cite as: 2001 WL 127303 (N.D.Ill.))**

c

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern
Division.
Derrick D. SMITH; Valerie D. Smith, and Amy C.
Walker, Plaintiffs,
v.
SHORT TERM LOANS, LLC; Brian D. Schulman;
James T. Cheslock; Barry Hershman; Wendy
Eager; and John Does 1-10, Defendants.
**No. 99 C 1288.**

Feb. 14, 2001.

MEMORANDUM OPINION AND ORDER

GOTTSCHALL, District J.

## Background

**\*1** Before the court are several pending motions in
this purported class action suit brought by Derrick
and Valerie Smith against defendants Short Term
Loans, LLC, Brian Schulman and James Cheslock,
as well as ten unnamed defendants. A description of
the relevant facts and the complicated procedural
history of this case is necessary to an understanding
of the court's disposition of these motions.

*Relevant Facts and Allegations*

This case is about short-term, "payday" loans.
These loans, at least initially, are for only a short
period of time, usually about two weeks. The
lenders generally charge a high rate of interest for
these loans. Frequently, although not always, the
lenders require some form of security for the loans.
At issue in this case are two different forms of se-
curity-postdated checks and wage assignments. The
plaintiffs in this case, who seek to represent classes

of similarly situated individuals, borrowed from
short-term lenders on several occasions. Defendant
Short Term Loans is an entity located in Elk Grove
Village, Illinois that specializes in making short-
term loans. Defendants Brian Schulman and James
Cheslock are attorneys licensed to practice in
Illinois. The plaintiffs allege that Schulman is an
employee of Short Term Loans or an affiliate. They
further allege that Cheslock is a "managing agent"
of Short Term Loans and spends "about 80% of his
time managing the loan business of Short Term
Loans." (4th Am. Compl. at 2).

Plaintiffs borrowed money from Short Term Loans
on several occasions. Between January 24, 1998
and September 25, 1998, Derrick Smith obtained 15
payday loans from Short Term Loans, in amounts
varying from $120 to $400. The annual percentage
rates (APR) on these loans ranged from 342.19% to
421.54%. Between February 5, 1998 and September
18, 1998, Valerie Smith obtained 11 loans, ranging
from $150 to $400 at rates from 342.19% to
391.07%. For each of these loans, the plaintiffs
signed an "Advance Contract and Disclosure State-
ment." These were generally pre-printed forms used
by Short Term Loans, with blanks left for personal
information, due date, amount, finance charge,
APR, and total payment. Short Term Loans used
different forms at different times, and the precise
form used, and disclosures made therein, are relev-
ant to some of plaintiffs' claims. The plaintiffs al-
lege that for each loan they obtained, they gave
Short Term Loans a postdated check. They also al-
lege that they executed wage assignments with each
loan obtained on or after May 16, 1998.

The plaintiffs' reasons for taking out the loans is in
dispute. The plaintiffs argue that the loans were
used for consumer purposes, such as buying chil-
dren's clothes and paying certain utility bills, al-
though they cannot say with specificity which loans
were used for what. The defendants argue that the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 127303 (N.D.Ill.)

**(Cite as: 2001 WL 127303 (N.D.Ill.))**

plaintiffs were sophisticated "Ponzi schemers" engaged in an elaborate check-kiting scheme. Specifically, the defendants argue that the plaintiffs would obtain payday loans from multiple lenders on multiple occasions, using one loan to pay off another. The defendants assert that the plaintiffs pledged their income to several lenders, borrowing more than their weekly income, and knowing that they could not repay all of the loans. The plaintiffs' intent, argue the defendants, was to defraud their creditors and to make a profit on this scheme. The plaintiffs readily admit that they used one loan to pay off others. They argue, however, that this was not part of a scheme, but rather an unfortunate downward spiral of necessity characteristic of payday borrowers. Plaintiffs further argue that Short Term Loans was well aware of this characteristic spiral, and actually facilitated it through their lending practices.

**\*2** At some point, plaintiffs stopped paying off their payday loans. In an effort to collect on the outstanding loans, Short Term Loans sent dunning letters to the Smiths. The letters were standard form letters used by Short Term Loans. The form letter at issue here read, in its entirety (including letterhead):

BRIAN D. SCHULMAN

ATTORNEY AT LAW

SHORT TERM LOANS, L.L.C.

1400 E. TOUHY AVE. # 100

DES PLAINES, ILLINOIS 60018

PHONE: 847-759-4646 Ext. 4646

FAX: 847-759-4680

February 18, 1999

Derrick Smith

510 Macie Ct. # 5

Addison, IL 60101

Re: Short Terms Loans, L.L.C.-Loan # 5265-Due Date: 10-09-98

Dear Mr. Smith:

This is your final opportunity to work out payments of your past due loan before I file a lawsuit against you. I urge you to contact me immediately upon receipt of this letter to arrange payment of the balance due.

Thank you in advance for your cooperation.

Sincerely,

s/ Brian D. Schulman

Brian D. Schulman

The letter sent to Ms. Smith was identical in all respects, except that it was addressed to her and contained the information specific to her loans. The name Brian D. Schulman in the letterhead is printed in a noticeably larger font than the rest of the letterhead. The Smiths apparently never fully repaid the loans. On February 26, 1999, they commenced this action.

*Procedural History*

The plaintiffs [FN1] filed their initial complaint on February 26, 1999. That complaint named as defendants Short Term Loans, Cheslock, Schulman, and ten unnamed defendants ("other officers, directors, shareholders, and managing agents" of Short

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 127303 (N.D.Ill.)
(Cite as: 2001 WL 127303 (N.D.Ill.))

Term Loans (Compl. at 3)). The complaint contained three individual claims and two class claims, including: 1) violations of the Truth in Lending Act (TILA) against only Short Term Loans, 2) violations of the Fair Debt Collection Practices Act (FDCPA) against Short Term Loans and Schulman on behalf of a purported class, 3) violations of the Illinois Wage Assignment Act against Short Term Loans, Cheslock, and Schulman on behalf of a purported class, 4) common law unconscionability against all defendants, and 5) violations of the Illinois Consumer Fraud Act (ICFA) against all defendants. Then, on March 22, 1999, the plaintiffs filed an amended complaint, which added corresponding class claims to the individual TILA, unconscionability, and ICFA claims. In June, 1999, the plaintiffs filed their first motion for class certification. Before the class certification issue was decided, the plaintiffs sought, and were granted, leave to file a second amended complaint. On July 6, 1999, the plaintiffs filed a second amended complaint, which made two changes: first, it removed the new class claims that the amended complaint had added; second, it purported to name two of the previously unnamed defendants, Barry Hershman and Wendy Eager.[FN2] Shortly thereafter, the plaintiffs again filed a motion for class certification.

> FN1. The initial complaint included as a plaintiff Amy C. Walker, who was later dismissed as a plaintiff for failure to prosecute her case. (Order 10/19/99).

> FN2. These two new named defendants were later dismissed by the court upon plaintiffs' oral motion. (Min. Order 6/1/01).

*3 Before that motion for class certification was decided, the court dismissed the second amended complaint, and denied the motions for class certification as moot. The court dismissed the TILA claim *sua sponte* because plaintiffs were seeking only

statutory damages under a provision for which statutory damages are not warranted. (Order 3/16/00 at 3) (citing *Brown v. Payday Check Advance,* 202 F.3d 987 (7th Cir.2000)). The court dismissed the FDCPA claim because the plaintiffs failed to allege that the loans were "primarily for personal, family, or household purposes" as required by the statute. (Order 3/16/00 at 3-5). Finally, the court declined to exercise supplemental jurisdiction over the remaining state law claims. (Order 3/16/00 at 5). On April 17, 2000, the plaintiffs filed a third amended complaint, on behalf of a purported class, alleging only a violation of the FDCPA, based on the same factual allegations contained in the earlier complaints, but adding an allegation that the loans were "for personal, family or household purposes, for example utility bills and children's clothing." (3d Am. Compl. at 4). The plaintiffs again filed a motion for class certification. Before that motion could be decided, the plaintiffs sought leave to file a fourth amended complaint maintaining the FDCPA class claim from the previous complaint (Count I), and adding claims, on behalf of a class, for violations of TILA (Count II) and ICFA (Count IV), as well as a common law unconscionability claim (Count III). The ICFA and unconscionability claims essentially mirrored the corresponding claims in earlier complaints. The new TILA claim, however, was based on a different statutory provision-one for which statutory damages are available. *See Jackson v. Check 'N Go of Illinois, Inc.,* 193 F.R.D. 544, 548 (N.D.Ill.2000) (statutory damages available for violations of 15 U.S.C. § 1638(a)(9)). Shortly thereafter, the defendants filed a motion for summary judgment attacking the single FDCPA claim in the third amended complaint. On September 18, 2000, the court entered an order granting the plaintiffs' motion for leave to file the fourth amended complaint. The plaintiffs filed their fourth amended complaint (described above), along with an "Amended Motion for Class Certification" (which corresponded to the claims in the fourth amended complaint) on October 2, 2000. The plaintiffs also

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 127303 (N.D.Ill.)

**(Cite as: 2001 WL 127303 (N.D.Ill.))**

filed a response to defendants' motion for summary judgment as to the FDCPA claim, including a cross-motion for summary judgment on that same claim. In addition, the plaintiffs moved for summary judgment as to liability on the new TILA claim added in the fourth amended complaint. Later in October, the defendants filed a motion to dismiss the fourth amended complaint in its entirety. The parties continued to brief the earlier summary judgment motions. The defendants also moved to strike certain exhibits attached to plaintiffs' brief in opposition to summary judgment on the FDCPA claim. Finally, on December 18, 2000, the plaintiffs filed a motion for entry of default judgment against defendants Short Term Loans and James Cheslock, and to compel defendants to produce loan documents related to the loans of any putative class members that remain unpaid.

**\*4** As a result of this convoluted procedural history, there are currently nine motions still pending before this court: 1) the defendants' motion for summary judgment as to the FDCPA claim, 2) the plaintiffs' cross-motion for summary judgment as to the FDCPA claim, 3) the defendants' motion to strike portions of the plaintiffs' response and cross-motion, 4) the plaintiffs' motion for summary judgment as to the new TILA claim, 5-6) the plaintiffs' outstanding motions for class certification (corresponding to both the third and fourth amended complaints), 7) the defendants' motion to dismiss the fourth amended complaint, 8) the plaintiffs' motion for default judgment, and 9) the plaintiffs' motion to compel.

## Analysis

The Federal Rules of Civil Procedure instruct that the class certification issue should be addressed "[a]s soon as practicable after the commencement of an action brought as a class action." Fed.R.Civ.P. 23(c)(1). Generally, the class certification question should be decided by the court be-fore dispositive motions as to the merits of the case. *See Cowen v. Bank United of Texas, FSB,* 70 F .3d 937, 941 (7th Cir.1995). The Seventh Circuit has recognized that, in some circumstances, decisions on dispositive motions may be made prior to the certification issue to determine whether "the claim of the named plaintiffs lacks merit." *See id.* In such cases, the defendants lose the preclusive effect of the judgment on the merits against would-be class members, but save the cost of defending a class action. *See id.* at 941-42. Given that there is doubt about the merits of the named plaintiffs' claims, and given that the defendants' motion to dismiss and motion for summary judgment are fully briefed, the court finds that it is in the interest of judicial economy to weed out the plaintiffs' meritless claims before addressing the complex class certification issues in this case.

## I. Defendants' Motion to Dismiss Fourth Amended Complaint

The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide its merits. *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir.1990). A court should dismiss a claim only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint." *Cook v. Winfrey,* 141 F.3d 322, 327 (7th Cir.1998) (citations omitted). The court must accept all well-pleaded factual allegations in the light most favorable to the plaintiff. *Colfax Corp. v. Illinois State Toll Highway Auth.,* 79 F.3d 631, 632 (7th Cir.1996).

The defendants make several distinct arguments in favor of dismissing the fourth amended complaint, some of which are repetitive of arguments made in briefing on the summary judgment and class certification motions. Those repetitive arguments will not be mentioned under this heading, but will be discussed below, in connection with the motions to which they are most applicable.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 127303 (N.D.Ill.)

**(Cite as: 2001 WL 127303 (N.D.Ill.))**

*Individual Defendants-All Claims*

**\*5** Defendants' first argument is that the plaintiffs fail to state a claim as to either of the individual defendants, Cheslock and Schulman. As to Count I, the defendants argue that the FDCPA regulations do not apply to the individual defendants because employees of a creditor are not "debt collectors," as defined by the statute, merely because of their employment with a creditor. This is certainly true. *See* 15 U.S.C. § 1692a(6)(A) (expressly excluding "any officer or employee of a creditor while, in the name of the creditor, collecting debts for such creditor"); *Pettit v. Retrieval Masters Creditors Bureau,* Inc., 211 F.3d 1057, 1059 (7th Cir.2000). However, the plaintiffs are not alleging that Schulman is a "debt collector" simply by his status as an employee of Short Term Loans. Defendants overlook the important statutory language including as a "debt collector" a "creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts." 15 U.S.C. 1692a(6). In *Laws v. Cheslock,* involving one of the individual defendants here and considering a similar collection letter (but with Cheslock's name in the letterhead), the court held that this language made Cheslock a debt collector under the FDCPA, since the letter would deceive the unsophisticated consumer. No. 98 C 6403, 1999 U.S. Dist. LEXIS 3416, at \*4-10 (N.D.Ill. Mar. 8, 1999); *see also Britton v. Weiss,* No. 89 CV 143, 1989 U.S. Dist. LEXIS 14610, at \*5 (N.D.N.Y. Dec. 8, 1989) ("the employee becomes a 'debt collector' when he does not act 'in the name of the creditor' "). The Seventh Circuit cases cited by defendant consider only other facets of the "debt collector" definition; they do not overrule the *Laws* reasoning respecting the specific inclusionary provision of § 1692a(6), applicable here. *See Pettit,* 211 F.3d at 1059 (shareholder and president not liable merely because of his status as such); *White v. Goodman,* 200 F.3d 1016, 1019 (7th Cir.2000) (same); *Aubert v. American Gen'l Fin-*

*ance, Inc.,* 137 F.3d 976, 978-79 (7th Cir.1998) (considering a specific exception to the definition for corporate affiliates). Nor do the defendants' cases undermine the reasoning of *Britton;* an employee is not exempted from liability by § 1692(6)(A)'s exclusion if he does not act in the name of the creditor. Because the complaint here alleges that Schulman's letter would mislead unsophisticated consumers into thinking it originated from a third party, the complaint sufficiently states an FDCPA claim against Schulman. The complaint, however, does not make any specific allegation of wrongdoing against defendant Cheslock, other than that he is a "managing agent" of Short Term Loans. As established by *Pettit,* that allegation is insufficient to state a claim against Cheslock under the FDCPA. *See Pettit,* 211 F.3d at 1059.

As to Count II, the TILA claim, the defendants argue that the statute only regulates "creditors" as defined by the statute. *See* 15 U.S.C. §§ 1602(f), 1609(a)(9). TILA defines a creditor as one who both regularly extends consumer credit and is the person to whom the debt is initially payable. 15 U.S.C. §§ 1602(f). Thus, defendants argue, the individual defendants cannot be liable under TILA because they did not actually lend any money. The plaintiffs do not dispute this. Because the individual defendants are not "creditors" under the statute, the plaintiffs fail to state a claim as to the individual defendants in Count II.

**\*6** As to Count III, the unconscionability claim, the defendants argue that Schulman and Cheslock cannot be liable because they did not personally make any loans with exorbitant interest rates. The plaintiffs do not respond to this argument. A common law claim of unconscionability is focused on the formation and terms of a one-sided contract. *See generally Mitchem v. American Loan Co.,* No. 99 C 1868, 2000 WL 290276, at \*4 (N.D.Ill. Mar. 17, 2000) (discussing claim of unconscionability in payday loans case). The complaint contains no allegations that Schulman or Cheslock personally

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 127303 (N.D.Ill.)

**(Cite as: 2001 WL 127303 (N.D.Ill.))**

entered into a loan agreement with plaintiffs. Nor does it contain any allegation that either Schulman or Cheslock even participated in the formation of any one of the contracts between Short Term Loans and the plaintiffs. Thus, the unconscionability claim is dismissed as to the individual defendants.

Finally, with respect to Count IV, the ICFA claim, the defendants argue that the statutory regulations apply only to lenders. The plaintiffs respond by arguing that ICFA also applies to employees if they either direct or permit violations of ICFA regulations. *See Garcia v. Overland Bond & Investment Co.,* 668 N.E.2d 199, 207 (Ill.App.Ct.1996). The statute itself regulates any "person," defined by the statute to include any "agent, employee, salesman ... [etc.]" of a corporation. 815 ILCS 505/1(c). Thus, if the complaint alleges that either Schulman or Cheslock participated in a violation of the ICFA regulations, it states a valid claim against that individual. Count IV alleges ICFA violations based on 1) the charging of exorbitant interest rates, 2) the failure to make proper disclosures with the loans, and 3) sending collection letters suggesting that an independent law firm was collecting the debts. Reading the complaint in the light most favorable to plaintiffs, and making a reasonable inference, it alleges that Schulman personally participated in the third category of activities by sending letters under his name. However, the complaint fails to make any allegations against Cheslock respecting any of these activities. Nowhere does the complaint allege, for instance, that Cheslock made a given loan without making the proper disclosures. Thus, Count IV states a claim against Schulman, but not against Cheslock.[FN3]

> FN3. The defendants suggest that because the individual defendants cannot be liable under TILA, they are therefore immune from liability under ICFA. (*See* Reply at 6 (citing *Taylor v. Quality Hyundai,* 932 F.Supp. 218 (N.D.Ill.1996) *aff'd in part, rev'd in part,* 150 F.3d 689 (7th Cir.1998)).

Although the fact that certain *conduct* was in compliance with TILA may be a defense to liability under ICFA, there is no reason to believe that ICFA cannot expand liability to reach *persons* whose conduct would be in violation of TILA, but who are otherwise immune from suit under TILA. *See Taylor,* 932 F.Supp. at 220 ("The Illinois Supreme Court determined that *conduct* authorized by TILA cannot constitute a violation of the ICFA.") (emphasis added). Thus, an employee of a lender may be immune from TILA liability but still subject to ICFA liability.

*Specificity in Pleadings-ICFA*

Defendants next argue that the plaintiffs fail to meet the specific pleading requirements for pleading a violation of ICFA. Under Federal Rule 9(b), a plaintiff alleging fraud or mistake must state with particularity "the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). The court will assume, for present purposes, that this standard applies to claims involving fraud under ICFA. The defendants argue that the plaintiffs have not adequately alleged proximate cause or damages with particularity. However, even under the heightened pleading standards of 9(b), the plaintiff need not plead cause or damages with the degree of particularity that defendants would require. Even though 9(b) requires particularity, the federal pleading system is still a notice pleading system. *See Christakos v. Intercounty Title Co.,* 196 F.R.D. 496, 504 (N.D.Ill.2000). Thus, more particularity is not required as to damages (and similarly causation) where the facts alleged are sufficient to put the defendant on notice of the who, what, where, when, and how of the misleading practice. *See id.; Cobb v. Monarch Finance Corp.,* 913 F.Supp. 1164, 1180, n. 4 (N.D.Ill.1995). The fact that plaintiffs did not use the words "proximate cause" or itemize damages is irrelevant. The plaintiffs alleged:

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 127303 (N.D.Ill.)

**(Cite as: 2001 WL 127303 (N.D.Ill.))**

"Plaintiff and the class members were damaged by defendants' unfair and deceptive acts and practices." (4th Am. Compl. at 13). At other places in the complaint, the plaintiffs adequately set forth the who, what, where, and when of the deceptive practices with particularity. Thus, the defendants are on notice of the nature of the ICFA claim against them.

*7 Further, although the defendants have support for their contention that an ICFA plaintiff must allege actual damages to maintain a private action, *see Duran v. Leslie Oldsmobile, Inc.,* 594 N.E.2d 1355, 1361-62 (Ill.App.Ct.1992), the court reads the allegation on page 13 of the fourth amended complaint as alleging actual, rather than statutory, damages. The plaintiffs, including also the purported class members, may be able to prove facts consistent with the complaint establishing actual damages proximately caused by the defendants' conduct. *See Taylor v. Bob O'Connor Ford, Inc.,* No. 97 C 0720, 1998 WL 177689, at *9 (N.D.Ill. Apr. 13, 1998); *cf. Dwyer v. American Express Co.,* 652 N.E.2d 1351, 1357 (Ill.App.Ct.1995) (even taking all alleged facts as true, the only damage plaintiff could have possibly suffered was receipt of unwanted mail). Although plaintiffs may eventually fail to show any such actual damages, a motion to dismiss evaluates only the sufficiency of the pleadings themselves. Thus, the plaintiffs have adequately alleged a claim under ICFA.

*Supplemental Jurisdiction-ICFA and Unconscionability*

Defendants next contend that the court should decline to exercise supplemental jurisdiction over the ICFA and unconscionability state law claims. This argument is based on *Gutierrez v. Devon Financial Services, Inc.,* No. 99 C 2647, 1999 U.S. Dist. LEXIS 19738, at *2-*5 (N.D.Ill.1999). In *Gutierrez,* the plaintiffs alleged, *inter alia,* a violation of ICFA and an unconscionability claim against a pay-

day lender based on exorbitant interest rates. The court declined to exercise subject matter jurisdiction over these state law claims because the Illinois Interest Act and the Consumer Installment Loan Act, when read together, allow a payday lender to charge any rate of interest it chooses to charge. The court reasoned that these statutes made it unlikely that exorbitant interest rates could nevertheless serve as the basis for a claim of unconscionability or for an ICFA claim. The question of whether either of these claims were viable, in light of the Illinois Interest Act and the Consumer Installment Loan Act, was a novel one under Illinois law and should be left for Illinois courts to decide. *See id.* at *3-*4.

The court recognizes that *Gutierrez* is squarely on point with the present case, to the extent that plaintiffs' claims are based on exorbitant interest rates. The unconscionability and ICFA claims, however, are not based solely on high interest rates, but also include allegations of other conduct. (4th Am. Compl. at ¶¶ 56(b)-(c), 66(b)-(c)). In any event, the *Gutierrez* case has not been consistently followed in this district. Judges in this district, when faced with one of the multitude of payday loan cases like this one, and when considering precisely this issue, have more often than not opted to exercise supplemental jurisdiction over ICFA and unconscionability claims. *See Donnelly v. Illini Cash Advance, Inc.,* No. 00 C 094, 2000 WL 1161076, at *5 (N.D.Ill. Aug. 16, 2000); *Davis v. Cash For Payday, Inc.,* No. 00 C 34, 2000 WL 639734, at *7 (N.D.Ill. Apr. 26, 2000) (listing several other cases); *Pinkett v. Moolah Loan Co.,* No. 99 C 2700, 1999 WL 1080596, at *8 (N.D.Ill. Nov. 2, 1999). In light of these cases, the court is inclined to exercise supplemental jurisdiction over the ICFA and unconscionability claims so long as one of the federal question claims survive.

*Relation Back-TILA*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 127303 (N.D.Ill.)
**(Cite as: 2001 WL 127303 (N.D.Ill.))**

**\*8** Finally, the defendants argue that plaintiffs' new TILA claim, added by the fourth amended complaint, is either time-barred or waived. The order entered by this court on September 18, 2000 indicated that the new TILA claim related back to the initial complaint, filed on February 26, 1999, under Federal Rule 15(c). (Order 9/18/00 at 2). Defendants suggest, however, that under Rule 15(c), a complaint can relate back only to the immediately prior complaint, because an amended complaint completely supplants the preceding complaint. (Mtn. to Dismiss at 12). Defendants maintain that once a claim from an earlier pleading is dropped in an amended pleading, that claim may not be "revived" by a later amendment to the amended pleading. In support of their arguments, defendants cite the following cases: *Ericson v. Slomer,* 94 F.2d 437 (7th Cir.1938); *Siakpere v. Boucher,* No. 84 C 6768, 1986 WL 5657 (N.D.Ill. May 7, 1986); *Lubin v. Chicago Title and Trust, Co.,* 260 F.2d 411 (7th Cir.1958); *Marx v. Loral Corp.,* 87 F.3d 1049 (9th Cir.1996); *King v. Atiyeh,* 814 F.2d 565 (9th Cir.1987); *London v. Coopers & Lybrand,* 644 F.2d 811 (9th Cir.1981). The first three of these cases do state a general rule that the filing of an amended complaint supplants the earlier complaint, leaving no function for the original complaint to perform. However, none of these cases dealt with the Rule 15(c) relation back question currently before the court. The other three cases come from the Ninth Circuit and set out that circuit's rule that a plaintiff who files an amended complaint omitting a claim that was earlier dismissed by the court waives that claim, even on appeal. This minority rule has been criticized by other courts, including the Second, Tenth, and Eleventh Circuits, as overly formalistic. *See Crysen/Montenay Energy Co. v. Shell Oil Co.,* 226 F.3d 160, 162 (2d Cir.2000) (noting cases in the Tenth and Eleventh Circuits that are also critical of the Ninth Circuit's position).

The court is not persuaded by the defendants' authorities. The plain language of Rule 15(c) states

that an amendment "relates back to the date of the *original* pleading when ... the claim ... asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth ... in the *original* pleading." Fed.R.Civ.P. 15(c) (emphasis added). Although the Rule does not define "original," the court finds that the plain meaning of that term refers to the very first such pleading. Moreover, the purpose of the Rule supports this conclusion. The rationale for permitting relation back under Federal Rule 15(c) is that the defendants, because of the original complaint, are on notice of the subject matter of the dispute and will not be unduly surprised or prejudiced by the later complaint. *See Hill v. Shelander,* 924 F.2d 1370, 1377 (7th Cir.1991). Surely the plaintiffs' original complaint, not to mention their first and second amended complaints, were sufficient to put the defendants on notice of the subject matter of this complaint-that is, the transactions that the plaintiffs were complaining of. To the extent that the waiver rule propounded in the Ninth Circuit cases applies to relation back under Rule 15(c), this court declines to follow it as overly formalistic and contrary to the liberal pleading policies of the Federal Rules. Although the TILA claim is based on different alleged statutory violations, it centers on the same loans and the same disclosure forms that have been the subject of each and every pleading filed by the plaintiffs. Thus, the court concludes that the new TILA claims are neither time-barred nor waived.

*Conclusion*

**\*9** For the foregoing reasons, the defendants' motion to dismiss is granted only in the following respects: 1) all claims against defendant Cheslock are dismissed, 2) Counts II and III are dismissed as to defendant Schulman. Defendants' motion to dismiss is denied in all other respects.

II. Cross-Motions for Summary Judgment and De-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 127303 (N.D.Ill.)
**(Cite as: 2001 WL 127303 (N.D.Ill.))**

fendants' Motion to Strike

Defendants' motion for summary judgment was directed at the single FDCPA claim alleged in the third amended complaint. The fourth amended complaint kept that claim intact as Count I. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must view the record and any inferences to be drawn from it in the light most favorable to the party opposing summary judgment. *See Griffin v. Thomas,* 929 F.2d 1210, 1212 (7th Cir.1991). The party opposing summary judgment may not rest upon the pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). There is no genuine issue for trial unless there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.* The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

The defendants make three distinct arguments in favor of summary judgment as to that claim: 1) the defendants are not "debt collectors," as defined by the FDCPA, thus rendering the FDCPA's regulations inapplicable, 2) the collection letter (set out above) was not the "initial written communication" to the plaintiffs regarding the delinquent debt, thus precluding a claim under § 1692(e)(11) of the FDCPA, and 3) the plaintiffs' borrowings were not for consumer purposes, as required for recovery under the statute. The plaintiffs filed a cross motion for summary judgment as to liability on the FDCPA claim.

*"Debt Collector"*

The court first addresses whether the defendants are "debt collectors," because if they are not, then the FDCPA is inapplicable. *See* 15 U.S.C. § 1692e. As discussed above, the term "debt collectors" includes any "creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts." 15 U.S.C. 1692a(6). After reviewing the record, the court finds that neither party is entitled to summary judgment on this issue because there is a genuine issue of material fact with respect to whether or not the defendants are "debt collectors" under the FDCPA.

*10 Courts have used an "unsophisticated consumer" standard when evaluating whether a letter appears to be from a third party in violation of the FDCPA. *See, e.g., Avila v. Rubin,* 84 F.3d 222, 227-29 (7th Cir.1996). The question of whether or not an unsophisticated consumer would be misled by the letter is a question of fact. *Walker v. National Recovery,* 200 F.3d 500, 502 (7th Cir.1999). In *Laws v. Cheslock,* the court granted summary judgment as to liability for the plaintiff in a case involving a dunning letter with very similar characteristics. *See Laws,* 1999 U.S. Dist. LEXIS 3416, at *12. The court based its decision on its own evaluation of the letter, including the potentially misleading letterhead and language.[FN4] The defendants argue that several Seventh Circuit cases decided after *Laws* implicitly overruled *Laws* by holding that a plaintiff must present a survey or other extrinsic evidence showing confusion in order to overcome summary judgment. (Reply in Supp. Summ. J. at 3) (citing *Pettit,* 211 F.3d 1057; *Aubert,* 137 F.3d 976; *White,* 200 F.3d 1016; *Walker,* 200 F.2d 500). The court, however, believes that defendants are reading too much into the *Pettit, Aubert, White,* and *Walker* decisions. To be sure, these cases have expressed a preference for survey evidence to show confusion, and even required it in some cases. Here, however, the court, like the *Laws*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 127303 (N.D.Ill.)

**(Cite as: 2001 WL 127303 (N.D.Ill.))**

court, finds that the letter itself presents enough ambiguity that an unsophisticated consumer might be misled by it. Unlike the cases cited by defendants, where the plaintiffs' interpretations were "fantastic conjecture" or "ingenious misreadings," here there is an ambiguity created by the letter itself, not an irrational misreading of it. *Cf. White,* 200 F.3d at 1020; *Pettit,* 211 F .3d at 1062. The potential for confusion here is obvious even to the court, such that plaintiff is not "merely speculat [ing] about how a naive debtor would interpret the letter." *Pettit,* 211 F.3d at 1061. Where the court, whose comprehension exceeds that of an unsophisticated consumer, believes that the letter has the potential to confuse, summary judgment may be inappropriate. *Rosenburg v. Transworld Systems, Inc.,* No. 98 C 5983, 2000 WL 420865, at *2 (N.D.Ill. Apr. 17, 2000); *see also Avila,* 84 F.3d at 226-27. This court, like the court in *Rosenburg,* can easily understand how a jury might find the letter so misleading as to violate the FDCPA.

> FN4. The court itself informally compared the letterhead of the letter in question to the letterhead of all the letters found in chambers, noting that the letters in chambers always listed an attorney's name *under* the name of his or her firm or company, not vice-versa. *See Laws,* 1999 U.S. Dist. LEXIS 3416, at *8 n. 1. The court concluded that a reasonable, unsophisticated consumer "certainly could be expected to rely on this basic tenet of company letterhead in determining the letter's origin." *Id.*

Despite the court's recognition of the letter's potential to mislead consumers, the court declines to find as a matter of law that the letter would mislead a consumer into believing it originated from an independent attorney. *Cf. Laws,* 1999 U.S. Dist. LEXIS 3416, at *10. A reasonable jury might find that the letter is not misleading. At this point, it becomes clear that plaintiff's cross-motion for summary

judgment as to liability on FDCPA must be denied, for there remains at least one material factual question left to be resolved before the plaintiff could be entitled to judgment as a matter of law on Count I.

*"Initial Communication"*

**\*11** Section 1692e of the FDCPA provides: "[T]he following conduct is a violation of this section: ... (11) The failure to disclose in the initial written communication with the consumer ... that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, and the failure to disclose in subsequent communications that the communication is from a debt collector." 15 U.S.C. § 1692e. The letters complained of are dated February 18, 1999. Defendants argue that these were not the "initial communication[s]" because a letter informing Derrick Smith that Short Term Loans intended to have his wages assigned was sent in November 1998. That letter, dated November 11, 1998 was attached to the Third Amended Complaint as Exhibit 27. The defendants do not point to any letter addressed to Valerie Smith that was dated prior to February 18, 1999. Plaintiffs maintain that the February letters violate § 1692e(11), but they do not respond to defendants' argument. Because the February letter to Derrick Smith was not the initial written communication by Short Term Loans, his FDCPA claim fails, but only to the extent that it is based on a violation of § 1692e(11).[FN5] Valerie Smith's claim under section 1692e(11), however, is not affected by defendants' argument on this point, since there is no evidence that the February 1999 letter was not the first communication regarding her outstanding debt.

> FN5. It is arguable that the letter violates the lesser regulations placed on a "subsequent communication" by the statute. As a "subsequent communication," though, the letter need only indicate that it is "from a debt collector." 15 U.S.C. §

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 127303 (N.D.Ill.)

**(Cite as: 2001 WL 127303 (N.D.Ill.))**

1692e(11). Although the letter does not use the exact term "debt collector," it need not do so to comply with the statute. *Ross v. Commercial Fin. Servs., Inc.,* 31 F.Supp.2d 1077, 1079-80 (N.D.Ill.1990). The February letter, read in context, could be interpreted only as originating from the creditor, Short Term Loans, or from an agent trying to collect on a debt for the creditor, attorney Brian Schulman. Thus, the letter clearly conveys that it is from a debt collector, although it does not explicitly use the statutory term. *See id.*

*Consumer Purposes*

Finally, defendants repeatedly argue that plaintiffs' loans were not "primarily for personal, family, or household purposes," making the FDCPA inapplicable. 15 U.S.C. § 1692a(5). Defendants maintain that the plaintiffs were engaged in a check-kiting scheme in order to defraud their creditors. The defendants note that there is scant evidence about the purpose of the loans, and that on some occasions during depositions, the plaintiffs could not identify what the money was used for. To overcome this motion for summary judgment, however, the plaintiff need only produce evidence from which a reasonable jury could find that the loans were used for consumer purposes. *See generally Anderson,* 477 U.S. 242. This the plaintiffs have done. Derrick Smith testified that funds from the loans were used for school clothes and household bills. (D. Smith Dep. at 21, 46). Whether or not to believe this testimony, in light of other countervailing evidence or gaps in evidence, is a question of credibility for the jury to decide. Although the Smiths could not identify which loans were used for what, there is sufficient evidence for a jury to find that the loans were used for household purposes. The statute's requirement that the loans be used primarily for personal, family, or household purposes cannot be so strict as to require a plaintiff to trace each dollar

borrowed to a consumer purchase in order to overcome summary judgment. This is especially true in the context of payday loans, where the amounts are generally small and the "rollovers" can be frequent.

*Defendants' Motion to Strike*

**\*12** Defendants moved to strike certain exhibits and statements of fact attached to the plaintiffs' response and cross-motion brief. These exhibits consisted of studies that tend to show patterns of borrowing behavior exhibited by short-term, payday borrowers. The court need not resolve this motion in order to dispose of the cross-motions for summary judgment. Even considering the additional evidence, plaintiff is not entitled to summary judgment because a question of fact remains: whether the letters would mislead an unsophisticated consumer into believing that they originated from a third party. And even without considering the studies, defendant is not entitled to summary judgment because the depositions alone create an issue of material fact as to whether the loans were for consumer purposes. Thus, defendants' motion to strike is denied as moot.

*Conclusion*

Defendants' motion for summary judgment is granted as to Derrick Smith's claim under Section 1962e(11), and denied in all other respects. Plaintiff's cross-motion for summary judgment is denied.

### III. Class Certification

After considering the defendants' dispositive motions, the court proceeds to address the pending motion for class certification. The plaintiffs technically have two outstanding motions for class certification. The first of the two was filed on June 28, 2000, and corresponded to the third amended com-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 127303 (N.D.Ill.)

**(Cite as: 2001 WL 127303 (N.D.Ill.))**

plaint, containing only the FDCPA claim. The second was filed on October 2, 2000, in connection with the fourth amended complaint, and was captioned "Amended Motion for Class Certification." This motion sought certification as to all four claims contained in the fourth amended complaint. In briefing for the latter motion, the parties incorporated their arguments from the earlier motion for certification. Thus, the October motion for class certification essentially supercedes the June motion. The motion for class certification filed on June 28, 2000, is therefore denied as moot. In the remaining motion, the issues surrounding certification vary with respect to each of the four current claims; thus, each claim will receive individual consideration under Federal Rule 23.

The prerequisites for certification of a class action are set forth in Federal Rule 23. A class may be certified only if "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). In order to maintain a class action for damages, the court must also find that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). With these requirements in mind, the court now turns to the purported classes under each individual claim.

*Count I: FDCPA*

**\*13** For the FDCPA claim, the plaintiffs propose a class consisting of all natural persons who were the subject of collection demands in the forms represented by Exhibit 27 to the motion for class certific-

ation (the Feb. 18, 1999 letter set forth above), sent on or after February 26, 1998 and not returned by the Postal Service.

A. Numerosity

Where the precise size of the class cannot be known until after complete discovery the court, in some situations, may still find that the numerosity requirement is met. Where it is general knowledge or common sense that the proposed class would be large, the court may assume that joinder would be impracticable. *See Rivera v. Grossinger Autoplex, Inc.,* No. 00 C 442, 2000 WL 1280904, at \*3 (N.D.Ill. Sep. 1, 2000). Here, the dunning letter sent by Short Term Loans was a form letter used to communicate with delinquent debtors. Thus, the court will take judicial notice of the fact that the number of persons receiving letters represented by the February 18, 1999 letters to the Smiths is so large that joinder would be impracticable.

B. Common Questions of Law or Fact

In order to meet the second requirement, a purported class representative need only show that there is one question of law or fact common to the resolution of the class members' claims. *See Rivera,* 2000 WL 1280904, at \*3. This requirement is usually met where the defendant has engaged in some standardized conduct, such as sending out form letters that are allegedly illegal. *See Keele v. Wexler,* 149 F.3d 589, 594 (7th Cir.1998). Here, there is at least one question common to the claims of all purported class members-namely, whether or not the letterhead on the dunning letter would mislead the reasonably unsophisticated consumer into believing that the letter originated from an independent attorney.

C. Typicality

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 127303 (N.D.Ill.)
**(Cite as: 2001 WL 127303 (N.D.Ill.))**

The typicality requirement is met if "it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Keele,* 149 F.3d at 595 (internal quotation marks and citation omitted). The Smiths assert that "typicality is inherent in the class definition." (Memo. Supp. of Am. Mtn. at 11). Defendants take issue with this characterization, pointing to several potential distinctions between the Smiths' claims and the claims of other purported class members. Only one of these distinctions is relevant to the FDCPA claim. The defendants argue that the Smiths' claims are not typical because they are subject to the unique defense that the loans were not for consumer purposes. As discussed above, the court finds that a question of fact remains as to whether the Smiths' loans were for consumer purposes. Nonetheless, the court concludes that the typicality requirement is met. Although a defense unique to the representative plaintiffs' claims is a factor for the court to consider, it need not destroy typicality in every case. *See* In Re: *Systems Software Assoc. Inc. Securities Litig.,* 97 C 177, 2000 WL 1810085, at *2 (N.D.Ill.Dec. 8, 2000). Only where litigation about the unique defense would consume the merits of the case will the existence of a defense necessarily defeat class certification. *See id.* Here, the question of whether or not the loans were for consumer purposes will be a minor issue at trial, when compared to the issues common to all of the class members. Most of the litigation will presumably focus on the legality of the dunning letters, and whether or not the defendants are "debt collectors" under the FDCPA, which are questions common to all of the purported class members' claims.[FN6] Thus, the typicality requirement is met.[FN7]

> FN6. The defendants apparently contend that the question of whether or not they are "debt collectors" under the statute precludes a class action because the Smiths' claims are not typical of those of the purported class. By definition, however, the class includes only those who received a letter in the form of the dunning letters the Smiths received. Whether or not the defendants are "debt collectors" turns on the misleading nature of those letters. Thus, plaintiffs' claims are typical. A finding that the Smiths themselves were not, in fact, misled by the letter would not destroy this typicality. Cases have analyzed this particular question by examining whether the letter would mislead a hypothetical, reasonable but unsophisticated debtor. *See Laws,* 1999 U.S. Dist. LEXIS 3416, at *10. Whether or not the Smiths were actually misled is irrelevant to this question.

> FN7. Although the court finds the Smiths' FDCPA claims, as a whole, typical of the claims of purported class members, there are individual differences with respect to the § 1692e(11) claim which make it more difficult to proceed as a class action. Specifically, the question of whether the dunning letter was the "initial communication" would need to be determined with respect to each individual class member. Indeed, the named plaintiffs' claims themselves seem to differ in this respect, making it questionable whether they are adequate representatives of the class as to this specific violation. As a result, the class certified as to the FDCPA claim will not be allowed to assert violations of § 1692e(11) as the basis for a class claim, but rather are limited to individual claims for any such violations.

### D. Adequate Representation

**\*14** The fourth requirement of Rule 23 is that the named plaintiff provide adequate representation for the interests of the class. This requirement is com-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 127303 (N.D.Ill.)

**(Cite as: 2001 WL 127303 (N.D.Ill.))**

prised of two separate inquiries: 1) Is the plaintiff's attorney qualified, experienced, and able to conduct the proposed litigation? 2) Does the plaintiff have interests antagonistic to those of the purported class members? *See generally Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 626 n. 20 (1997). Defendants only challenge the named plaintiffs' adequacy under the second inquiry. Defendants argue that the Smiths cannot fairly represent the class because they did not use the loans for consumer purposes, but rather were "Ponzi schemers." (Opp. to Am. Mtn. at 12). As discussed above, this is an unresolved factual question. Moreover, it is a factual question that will not dominate the litigation. Finally, it is not at all clear that this unique defense necessarily creates a conflict of interest between the Smiths and the other purported class members. In short, the court will not deny certification of an otherwise valid FDCPA class simply because the defendants have made allegations that the named plaintiffs were not consumers.

### E. Predominance and Superiority

In addition to the four requirements of Rule 23(a), a plaintiff seeking to certify a class action for damages under Rule 23(b)(3) must also show that common questions predominate and that a class action is superior to other methods of adjudication. Fed.R.Civ.P. 23(b)(3). As intimated above, common questions will predominate. The only individual question arguably left for resolution would be whether or not the loans were used for consumer purposes. Questions about the legality of the dunning letter under the FDCPA will be common to the entire class. Finally, a class action is the best way to resolve the claims of the purported class. Where, as here, the defendant engaged in standardized conduct (sending form dunning letters) that affected many consumers, but where an individual consumer's claim would be too small to justify bringing an individual suit, a class action is particularly suited to the resolution of the consumers' claims.

*See Rivera,* 2000 WL 1280904, at *5.

Much of the analysis concerning certification of the FDCPA class applies by analogy to the remaining class claims, including the TILA claim.[FN8] As a result, the discussion of the remaining claims will focus only on the defendants' specific arguments against certification that are addressed to each particular claim.

> FN8. For instance, although the TILA claim is defined by reference to disclosure forms rather than the dunning letters, common sense still indicates that the number of persons obtaining loans pursuant to the standardized disclosure forms is also large enough to make joinder of all the parties impracticable.

### Count II: TILA

With respect to the TILA claim, plaintiffs seek to certify a class of all persons with Illinois addresses who signed a document "in the form of the loan agreements attached to the complaint." (Am. Mtn. for Class Cert. at 2). There were several slightly different loan agreement/disclosure forms attached to the complaint.

The defendants argue that certification of the TILA class would be inappropriate for three reasons. First, the defendants argue that the settlement of a prior class action suit against Short Term Loans bars recovery under TILA for all class members except those who, like the Smiths, opted out of that class. Second, the defendants argue that the TILA claims cannot proceed as a class action because the disclosure forms used by Short Term Loans varied. Third, the defendants argue that there is no way to tell whether or not a security interest was given in any particular case, forcing the court to make individual determinations as to each purported class member. The court finds each of these reasons unpersuasive.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 15

Not Reported in F.Supp.2d, 2001 WL 127303 (N.D.Ill.)

**(Cite as: 2001 WL 127303 (N.D.Ill.))**

**\*15** In *Anderson v. Short Term Loans,* 98 C 4949, the plaintiffs alleged class claims against Short Term Loans under TILA and common law unconscionability. (Opp. to Am. Mtn., Exh. C). A settlement class was certified, consisting of all natural persons who "received disclosure statements prepared suing the same form represented by Exhibit A to the settlement agreement" on or after August 11, 1997 and "were listed by Defendants as identified class members pursuant to the Settlement Agreement." (Order 4/22/99, Opp. to Am. Mtn., Exh. C). In exchange for certain payments, the plaintiffs released Short Term Loans, its officers, directors, and employees "of and from all causes of action, suits, claims and demands [etc.] arising out of the claims made on behalf of the class members" in the *Anderson* case and a related case. Thus, as the defendants here maintain, the released claims were defined by the complaint in *Anderson.* But the class granting the release was limited to those Short Term Loans customers who received disclosure statements in the form at issue in the *Anderson* case (referred to by the parties as the 1/21/98 form, the date it was apparently created). Here, plaintiffs are alleging claims based on different disclosure forms. Thus, the defendants are mistaken to conclude that the Smiths can represent only those who opted-out of *Anderson.* Plaintiffs may proceed to represent any purported class members who received a disclosure agreement different in form than the one represented by Exhibit A attached to the *Anderson* complaint. (Opp. to Am. Mtn., Exh. C). The parties have made it clear that several different forms were used, and there is reason to believe that several potential plaintiffs, like the Smiths, received forms different from the 1/21/98 form at issue in the *Anderson* complaint.[FN9] As this court earlier stated: "Given the 'hypertechnical' nature of TILA actions ... loans involving these different disclosure statements could give rise to different causes of action, and as a result they do not fall within the scope of the settlement agreement." (Order 9/18/00 at 2) (citation omitted).[FN10]

FN9. The court is aware that some borrowers may have, on separate occasions, received both a disclosure form like the one in *Anderson,* and a form like one of those at issue in this case. This fact is not sufficient to preclude such borrowers from participating in the present purported class action. Their claims based on non-*Anderson* forms do not arise out of the claims asserted in the *Anderson* complaint, and therefore are not barred by the settlement agreement.

FN10. In addition, it should be noted that the violations alleged in the *Anderson* complaint differ from the violations alleged in this case. In *Anderson,* the TILA claim was based on the inconspicuous nature of the finance charges and APR's on the disclosure form, not the sufficiency of security interest disclosures.

Next, defendant maintains that the TILA claim may not proceed as a class action because the disclosure forms used by Short Term Loans varied among the class members. Defendants point out that the purported class will include claims under five different disclosure statements. The problem, defendants argue, is that the court "will have to make an individual determination with regard to whether each particular form violates TILA." (Opp. to Am. Mtn. at 8). As mentioned above, the hypertechnical nature of TILA will indeed give rise to the possibility that some forms adequately disclose the security interests while others do not. Nevertheless, the court finds that each of the forms will still raise common questions of law and fact. The most efficient resolution of all of the potential plaintiffs' claims is not to force a named plaintiff to bring a separate action based on each and every different form used. Although the *Anderson* settlement limited the class to those who received one particular form, there is no reason that the class in this case should be similarly limited. The forms at issue are

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 127303 (N.D.Ill.)

**(Cite as: 2001 WL 127303 (N.D.Ill.))**

similar and one court can resolve common questions concerning all of the forms in one action. Thus, the court declines to narrowly limit the class to persons receiving only one particular form.

**\*16** Finally, the defendants argue that the class claims are not common and that the members of the class will be impossible to identify because not every loan involved a security interest in wages or a post-dated check. This is the most difficult obstacle to class resolution of the claims involved in this case. It is undisputed that Short Term Loans often took security interests in wage assignments or post-dated checks, but *sometimes did not.* Thus, not every single customer who received an inadequate disclosure statement will have a valid claim under TILA for failure to disclose a security interest. The defendant, however, is at least partially to blame for this difficulty. Although arguably required to keep copies of all documents pertaining to security interests taken, *see* 38 Ill. Adm.Code § 110.30, the defendants relied solely on the disclosure statements for record-keeping purposes and gave the wage assignment forms or post-dated checks back to debtors after loans were repaid. Where, as here, the disclosures on the disclosure statements are themselves at issue, that record-keeping system is insufficient to identify whether or not a security interest was actually taken. Whether or not giving back the security documents without keeping copies is a violation of Illinois law, it is certainly a less-than-ideal record-keeping system for purposes of determining compliance with TILA's disclosure requirements. The court will not let the natural results of such record-keeping practices preclude a class action against the defendants.

*Counts III-IV: Unconscionability and ICFA*

As to unconscionability and ICFA, the plaintiffs seek to certify a class consisting of all persons with Illinois addresses who "obtained a loan from defendants at a rate exceeding 300% ... [o]n or after a date 5 years (unconscionability) or 3 years (Consumer Fraud) prior to the filing of suit." (Am. Mtn. for Class Cert. at 2). The defendants make only one argument peculiar to these two claims. Defendants argue that the purported class will include persons whose claims for excessive interest rates were released under *Anderson.* The court agrees with the defendants' concern on this point. The class definition for the unconscionability and ICFA claims is not limited by reference to what disclosure forms were used. Thus, the purported class will include some individuals who received an *Anderson* form, and whose interest rate claims are therefore barred by the settlement. Rather than denying certification, however, the court will modify the class definition for these claims so that the class includes:

a. All persons with Illinois addresses (according to defendants' records);

b. Who obtained a loan from the defendants at a rate exceeding 300% and, in connection with that loan, signed a disclosure statement in a form other than the 1/21/98 form at issue in the *Anderson* case;

c. On or after a date 5 years (unconscionability) or 3 years (Consumer Fraud) prior to the filing of this suit.

*Identification of Class Members*

**\*17** The court is aware of the obvious difficulties that will arise in identifying the members of the certified classes who are ultimately entitled to recover, especially as to the TILA claims. But a class action serves not only to compensate plaintiffs, but also to deter defendants from engaging in "piecemeal highway robbery" by violating the law but causing only small damages to many plaintiffs. *See Miller v. McCalla, Raymer, Padrick, Cobb, Nichols & Clark, LLC,* No. 98 C 5563, 2001 WL 62697, at \*3 (N.D.Ill. Jan. 25, 2001). Thus, the court finds that a class action is the superior method

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 127303 (N.D.Ill.)
**(Cite as: 2001 WL 127303 (N.D.Ill.))**

for resolving the claims of the potential plaintiffs. The administration of this class action and the potential recovery for the class members is discussed in more detail below.

*Conclusion*

For the foregoing reasons, plaintiffs' amended motion for class certification is granted, as modified by this order.

IV. Plaintiff's Motion for Summary Judgment

The named plaintiffs have moved for summary judgment as to liability on the TILA claim. Plaintiffs argue that there is no genuine issue of material fact as to whether Short Term Loans' disclosure statements violate TILA. The court, in the interests of judicial economy and fairness to the class, declines to resolve the plaintiffs' motion on the merits of the TILA claim at this time. Unlike the defendants' motion to dismiss and motion for summary judgment, a resolution of this motion would significantly affect the interests of the absent class members. Those class members should be given the opportunity to opt-out or object to the adequacy of representation before a judgment is entered on the merits binding the parties. Moreover, the court believes that further briefing on this issue would be productive in light of this opinion.

V. Plaintiffs' Motions for Default Judgment and to Compel

Plaintiffs have moved for entry of a default judgment and an order compelling defendants to turn over any and all documents relating to the claims of putative class members who have unpaid loans. At oral argument, plaintiffs essentially asked this court to 1) certify a class consisting of all customers having loan disclosure forms like those attached to the complaint, and 2) enter a default judgment on the

TILA claims of that class because there is no way of finding out which borrowers executed a wage assignment or gave a post-dated check in connection with their loans. The problem of identifying class members entitled to recovery, as noted above, makes resolution of the TILA class claims difficult. Moreover, the defendants are at least partially at fault for inadequate (and perhaps illegal) record-keeping practices. However, the court is unwilling to grant plaintiffs the extreme remedy they seek.

Default judgment or dismissal is within the court's inherent powers to sanction for conduct which abuses the judicial process, but it is an extreme sanction. *See Cohn v. Taco Bell Corp.,* No. 92 C 5852, 1995 WL 519968, at *5 (N.D.Ill. Aug. 30, 1995). Where a party has an obligation to preserve documents, but fails to do so, sanctions may be warranted. *See id.* Here, whether the defendants had an obligation to preserve the loan documents is an arguable question of Illinois law. *See* 205 ILCS 670/11; 38 Ill. Adm.Code § 110.30. The Illinois Consumer Installment Loan Act requires that a lender retain "such records as are required by the Director to enable the Director to determine whether the licensee is complying with the provisions of this Act." 205 ILCS 670/11. Included in the Act is a provision requiring lenders to disclose to the borrower the type of security interest held. *See* 205 ILCS 670/16(k). Thus, it appears that defendants were obligated to preserve a record of the type of security interest held for each loan in order to determine compliance in a situation exactly like this one. The defendants argue that any such obligation to preserve documents lasted for only two years. *See* 205 ILCS 670/11. They point out that the documents were not requested by the plaintiffs until October 2000, and argue that they therefore had no obligation to produce any documents for loans that were paid in full before October 1998. The defendants, however, were on notice of litigation concerning the propriety of their loan disclosures well before that. The original complaint, filed in February, 1999, con-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 127303 (N.D.Ill.)

**(Cite as: 2001 WL 127303 (N.D.Ill.))**

tained general allegations of inadequate disclosures. (Compl.¶¶ 68, 71). At the very least, defendants were on notice of the specific security interest disclosure allegations in August, 2000, when the plaintiffs moved for leave to file the fourth amended complaint. The TILA claims, by definition, are limited to loans that originated on or after April 6, 1998 (the date that the earliest non-*Anderson* form was created). Documents concerning these loans should have been preserved until at least April, 2000.[FN11] As a result, most, if not all, of the loan documents should have been in the possession of the defendants in August, 2000, the latest date on which the defendants could possibly have received notice of the disclosure claims. Thus, the court may sanction the defendant, pursuant to its inherent powers, for failure to preserve those documents.[FN12]

> FN11. And likely even later than that, since the statute requires preservation for two years from the "final entry" for each loan, not from the origination date. *See* 205 ILCS 670/11.

> FN12. Defendants also argue that only the Director may enforce the record-keeping provisions of the Illinois Consumer Installment Loan Act. This point is irrelevant. The statutes imposed an obligation on defendants to preserve records sufficient to determine compliance with a disclosure requirement. The nature of the obligation was such that the defendants were necessarily on notice of the need to keep disclosure-related documents, in case of a dispute such as this one. The court concludes that it is well within its inherent powers to craft an acceptable solution to the problem which includes the possibility of making adverse inferences against the defendant in the absence of direct proof.

**\*18** The court, however, is hesitant to enter a default judgment against defendants in the absence of any evidence of bad faith. The plaintiffs produce no evidence suggesting that Short Term Loans' inadequate record-keeping system was used to avoid liability. The defendants' practice was to return original loan documents to borrowers after a loan was fully paid. Illinois law requires this of lenders. *See* 38 Ill. Adm.Code § 110.90. That defendants did not keep copies of the documents might have been sloppy, and perhaps in violation other provisions of Illinois law, but it does not establish bad faith. Although bad faith is not a strict prerequisite to entry of default judgment, the court should exercise restraint before imposing such a sanction, and should consider the nature of defendants' conduct as well as the prejudice to the plaintiffs. *See Cohn,* 1995 WL 519968, at \*5. Because the court is able to craft an alternative solution that will reduce the prejudice to the plaintiff, and in light of the fact that defendants' conduct was merely negligent, the court declines to enter a default judgment in favor of the entire class.

Nonetheless, the court is also unwilling to permit the defendants to avoid liability under TILA simply because of their inadequate record-keeping system. Thus, the solution the court has reached respecting the TILA claims is somewhat of a compromise. The classes, as defined above, are certified pursuant to Federal Rule 23(b)(3). After notice has been given to the class members, the court will determine which, if any, of the disclosure forms would violate TILA if a security interest had been taken. Any potential class member who can prove that he or she executed a wage assignment or gave a post-dated check in connection with a loan involving an inadequate disclosure form will be entitled to an individual recovery. If the number of individual class members having such proof is insufficient to bring the total recovery up to the statutory cap of $500,000 or 1% of net worth, then the plaintiff may put forth evidence tending to show what percentage of loans executed by Short Term Loans are accom-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 127303 (N.D.Ill.)

**(Cite as: 2001 WL 127303 (N.D.Ill.))**

panied by a security interest in wages or post-dated checks. In evaluating this evidence, the court will make reasonable inferences in favor of the plaintiff, in light of the fact that this problem was created, in part, by defendants' record-keeping practices. The court will then determine the proper amount of damages based on the considerations for class action damages enumerated in 15 U.S.C. § 1640.

Finally, plaintiffs have moved to compel the defendants to produce loan documents pertaining to borrowers who have loans currently outstanding with Short Term Loans. Given the resolution of the other pending motions in this case, the court finds that such information would be relevant. If nothing else, these documents would be helpful in determining the approximate percentage of loans executed by Short Term Loans that are accompanied by security interests in wages or post-dated checks. Regardless of any prior discovery agreements between the parties, this information should now be provided to the plaintiffs. Thus, plaintiffs motion to compel is granted.

Conclusion

**\*19** For the foregoing reasons, the court hereby orders the following:

1) Defendants' motion to dismiss the Fourth Amended Complaint [70] is granted as to all claims against defendant Cheslock and as to Counts II and III against defendant Schulman, and denied in all other respects.

2) Defendants' motion for summary judgment [55] is granted as to Derrick Smith's claim under Count I, only insofar as it is based on a violation of 15 U.S.C. § 1692(e)(11), and denied in all other respects.

3) Plaintiffs' cross-motion for partial summary judgment as to the FDCPA claim [64] is denied.

4) Defendants' motion to strike exhibits [71] is denied as moot.

5) Plaintiffs' motion for class certification as to the Third Amended Complaint [49] is denied as moot.

6) Plaintiff's "Amended Motion for Class Certification" as to the Fourth Amended Complaint [63] is granted as modified by this Order.

7) Plaintiffs' motion for entry of default judgment [81-1] is denied.

8) Plaintiffs' motion to compel [81-2] is granted.

N.D.Ill.,2001.
Smith v. Short Term Loans
Not Reported in F.Supp.2d, 2001 WL 127303 (N.D.Ill.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1989 WL 117057 (E.D.N.Y.), RICO Bus.Disp.Guide 7325
**(Cite as: 1989 WL 117057 (E.D.N.Y.))**

c

United States District Court, E.D. New York.
Robert M. CALICA and Jill R. Calica, Plaintiffs,
v.
INDEPENDENT MORTGAGE BANKERS, LTD.
(d/b/a Independent Mortgage), Alvin Cohen,
Lawrence Scaduto and Barbara Cohen, Defendants.
**No. CV 88-0452(RR).**

Sept. 28, 1989.

Robert C. Calica, Garden City, N.Y., for Jill Calica
and plaintiff pro se.

William S. Kaye, Valley Stream, N.Y., for defend-
ants Independent Mortage Bankers, Alvin Cohen
and Barbara Cohen.

Lawrence W. Scaduto, defendant pro se.

*MEMORANDUM and ORDER*

RAGGI, District Judge:

*1 Plaintiffs, Robert and Jill Calica, charge defend-
ants with racketeering, 18 U.S.C. § 1961 *et seq.*
(1984), and various violations of the Truth-
in-Lending Act, 15 U.S.C. § 1601 *et seq.* (1982),
and the Real Estate Settlement Procedures Act
("RESPA"), 12 U.S.C. § 2601 *et seq.* (1980), stem-
ming from their unsuccessful attempt to secure a
home refinancing loan in 1987. In a Memorandum
and Order dated June 28, 1989, this court granted
defendants' motion to dismiss the RESPA claim in
its entirety and so much of the racketeering claim
as was brought against Independent Mortgage
Bankers, Ltd. and Barbara Cohen. The court per-
mitted plaintiffs to replead the racketeering claim
against other named defendants to allege the neces-
sary interstate commerce nexus. It further permitted
plaintiffs to submit supplemental papers regarding

the Truth-in-Lending claim. Finally, it asked
plaintiffs to respond to the motion for sanctions by
Barbara Cohen.

Having reviewed all supplemental papers filed by
the parties, the court hereby dismisses plaintiffs'
Truth-in-Lending claim, permits discovery as to the
racketeering claim, and denies sanctions.

*Factual Background*

The underlying facts are discussed at length in this
court's memorandum and order of June 28, 1989,
familiarity with which is assumed.

*Discussion*

I. *Truth-in-Lending Act*

The thrust of plaintiffs' Truth-in-Lending claim is
that defendants failed to comply with that portion
of Regulation Z, 12 C.F.R. § 226.1 *et seq.,* requir-
ing a "creditor" to disclose certain information in
conjunction with credit transactions, specifically
"[t]he identity of the creditor making the disclos-
ures." This court asked plaintiffs to address the
question of whether Independent Mortgage Bankers
was in fact subject to Regulation Z given that it is
not a lender but a loan broker. The Truth-
in-Lending Act had originally included in the defin-
ition of "creditor" one "who regularly arranges for
the extension of consumer credit," as well as one
who actually extends credit. 15 U.S.C. § 1602(f)
(1980). In 1982, however, Congress amended the
statute to delete the quoted portion. 15 U.S.C. §
1602(f) (1982).[FN1].

In support of their claim, plaintiffs cite to a number
of cases applying the statute and its regulations to
entities that broker or arrange consumer credit. All
of these cases, however, involve transactions pre-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1989 WL 117057 (E.D.N.Y.), RICO Bus.Disp.Guide 7325
**(Cite as: 1989 WL 117057 (E.D.N.Y.))**

dating the statutory amendment, and are thus not relevant to this case.

Similarly, plaintiffs' contention that the statute's purposes are better advanced by applying Regulation Z both to loan brokers as well as actual lenders is irrelevant in the face of the statutory amendment deleting just such a provision. *See generally Japan Whaling Ass'n v. American Cetacean Society,* 478 U.S. 221, 233 (1986) (when Congress has directly addressed issue, no further inquiry as to intent is necessary). Certainly, it is for Congress to decide which aspects of loan transactions and which participants therein will be subject to federal regulation. Congress having deliberately amended the definition of "creditor" to delete loan brokers, the court must dismiss plaintiffs' Truth-in-Lending claim against defendants.

*2 The court further notes that plaintiffs never actually incurred any indebtedness to defendants and have cited to no authority contradicting the considerable body of case law holding that Truth-in-Lending Act claims can only be maintained where a loan transaction has been consummated. *E.g., Clark v. Troy and Nichols, Inc.,* 864 F.2d 1261-1263-64 (5th Cir.1989); *Bourgeois v. Haynes Const. Co.,* 728 F.2d 719, 720 (5th Cir.1984); *Nash v. First Financial Sav. & Loan Ass'n,* 703 F.2d 233, 238-39 (7th Cir.1983); *Harman v. New Hampshire Savings Bank,* 638 F.2d 280, 283 (1st Cir.1981); *Waters v. Weyerhauser Mortgage Co.,* 582 F.2d 503, 505 (9th Cir.1978); *Bryson v. Bank of New York,* 584 F.Supp. 1306, 1317 (S.D.N.Y.1984). Instead, they argue simply that the protection of the Act's disclosure provisions are as logically applicable to individuals, such as themselves, who apply for, but never receive, loans, as to those who in fact "become contractually obligated on a credit transaction." 12 C.F.R. § 226(a)(13). While there may be benefits in not having false or inaccurate information provided to any prospective borrower, there is obviously more reason for concern when an individual actually becomes indebted in reliance on

such terms than when no debt obligation is incurred. Thus, as the First Circuit's analysis of the statutory language demonstrates, Congress' concern in enacting this legislation was with protecting consumers who actually assumed debt in reliance on statements made to them by creditors. *Harman v. New Hampshire Savings Bank, supra.* Plaintiffs not coming within this category of borrowers, their Truth-in-Lending Act claim is dismissed.

## II. *Racketeering*

### A. *Interstate Commerce Nexus*

In its June 28, 1989 memorandum, this court noted plaintiffs' failure to plead that Independent Mortgage Bankers was an enterprise "engaged in, or the activities of which affect[ed], interstate or foreign commerce." 18 U.S.C. § 1962. The criteria for establishing the required nexus between a RICO enterprise and interstate commerce are not very stringent. *See, e.g., R.A.G.S. Couture, Inc. v. Hyatt,* 774 F.2d 1350 (7th Cir.1985). Indeed, as was noted in *Ferleger v. First American Mortgage Co.,* 662 F.Supp. 584, 588 (N.D.Ill.1987), "[i]t is difficult to imagine how a mortgage broker could avoid participating in national credit markets." Nevertheless, given that in this case: (1) there is no claim that Independent Mortgage Bankers ever successfully made or arranged a loan-much less one requiring resort to national credit markets, and (2) that all communications with the Calicas, whether by mail or wire, were intrastate,[FN2] legitimate questions exist as to whether the enterprise in fact engaged in or affected interstate commerce.

Plainly, it is appropriate to grant plaintiffs some discovery before resolving this question, particularly since it was initially raised not by defendants but by the court. Thus, the RICO claim against Messrs. Cohen and Scaduto will not be dismissed.

### B. *Sanctions*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1989 WL 117057 (E.D.N.Y.), RICO Bus.Disp.Guide 7325
**(Cite as: 1989 WL 117057 (E.D.N.Y.))**

*3 Plaintiffs acknowledge that a defendant must be charged with the commission of at least two acts of racketeering to be named in a substantive RICO cause of action. *See Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496, n. 14 (1985). Moreover, they acknowledge that, in the Second Circuit, a defendant charged with having a RICO conspiracy must be alleged to have agreed personally to commit at least two acts of racketeering. *United States v. Ruggiero,* 726 F.2d 913 (2d Cir.), *cert. denied,* 469 U.S. 831 (1984); *accord United States v. Rastelli,* 870 F.2d 822, 828 (2d Cir.1989).FN3

Plainly, plaintiffs have not alleged two acts of racketeering either committed or agreed to by Barbara Cohen. The only act that she is alleged to have committed in furtherance of the enterprise's goals was the withdrawal of money from an Independent Mortgage Bankers' account. Even assuming that this constitutes an act of racketeering-or can be seen as aiding and abetting an act of racketeering-the fact remains that at least one other such act is necessary to satisfy the statute. Plaintiffs having failed to articulate such a second act of racketeering, this court dismissed the claim against Ms. Cohen.

Plaintiffs now seek to avoid sanctions by noting that the majority of other circuits have permitted RICO conspiracy claims to be maintained against persons who did not themselves agree to commit two acts of racketeering. *See United States v. Kragness,* 830 F.2d 842, 860 (8th Cir.1987) (and cases cited therein). It is, of course, not appropriate to sanction an attorney who unsuccessfully attempts to advance reasonable grounds for modifying or reversing existing case law. *Eastway Constr. Co. v. City of New York,* 762 F.2d 243, 254 (2d Cir.1985). This court seriously questions whether plaintiffs' RICO claim against Barbara Cohen-which relied only on the substantive sections of the statute-was in fact brought in an effort to urge modification or reversal of this Circuit's standard for RICO conspiracies. But since all doubts must be resolved "in fa-

vor of the signer" of the complaint, *Oliveri v. Thompson,* 803 F.2d 1265, 1275 (2d Cir.1986), *cert. denied,* 480 U.S. 918 (1987), the court declines to award sanctions.

### Conclusion

The court hereby dismisses plaintiffs' claim under the Truth-in-Lending Act. It directs that discovery ensue as to the racketeering claim against Messrs. Cohen and Scaduto. Sanctions for the filing of racketeering claim against Barbara Cohen are denied.

SO ORDERED.

FN1. As now defined in 15 U.S.C. § 1602(f), "[t]he term 'creditor' refers only to a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement."

FN2. The fact that the mails are recognized to be an instrumentality of interstate commerce does not automatically mean that the intrastate use of the mails by an enterprise not otherwise shown to have any interstate nexus satisfies the requirements of RICO. *C.f., R.A.G.S. Couture, Inc. v. Hyatt,* 774 F.2d 1350 (7th Cir.1985).

FN3. Apparently, plaintiffs are now urging this court to read their complaint to state a RICO conspiracy claim.

E.D.N.Y.,1989.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1989 WL 117057 (E.D.N.Y.), RICO Bus.Disp.Guide 7325

**(Cite as: 1989 WL 117057 (E.D.N.Y.))**

Calica v. Independent Mortgage Bankers, Ltd.

Not Reported in F.Supp., 1989 WL 117057 (E.D.N.Y.), RICO Bus.Disp.Guide 7325

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2004 WL 1403711 (N.D.Ill.)
**(Cite as: 2004 WL 1403711 (N.D.Ill.))**

н

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois, Eastern Division.
Deborah and Kwanza HAMILTON, on behalf of
themselves and all others similarly situated,
Plaintiffs,
v.
O'CONNOR CHEVROLET, INC., Defendant.
**No. 02 C 1897.**

June 23, 2004.

Lance A. Raphael, Stacy Michelle Bardo, Consumer Advocacy Center, Chicago, IL, Dmitry N. Feofanov, Chicago Lemon Law.Com, Dixon, IL, for Plaintiffs.

Michael H. Moirano, Robert D. Sweeney, Nisen & Elliott, Brian Thomas Bailey, James M. Bailey, Bailey & Bailey, Chicago, IL, for Defendant.

MEMORANDUM OPINION AND ORDER
GRANTING IN PART AND DENYING IN PART
DEFENDANT O'CONNOR CHEVROLET, INC.'S
MOTION FOR SUMMARY JUDGMENT

FILIP, J.

**\*1** Plaintiffs Deborah and Kwanza Hamilton ("Plaintiffs" or "the Hamiltons") purchased an automobile from O'Connor Chevrolet, Inc. ("Defendant" or "O'Connor") and have brought suit regarding that transaction under various federal and state statutes. The Court's jurisdiction is premised on federal questions presented in Counts I, III, and VI of Plaintiffs' Second Amended Class Action Complaint ("Second Amended Complaint"), which are brought, respectively, under the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA"), the

Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.* ("ECOA"), and the Federal Odometer Act, 49 U.S.C. § 32701 *et seq.* ("Odometer Act"). As discussed more fully below, Judge Lefkow previously dismissed Counts II and IV, which were also brought under TILA and the ECOA, respectively. Count V alleges a violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.,* but the parties do not dispute that the Magnuson-Moss claim cannot provide a jurisdictional basis here because of the relatively small amount of money at issue in Plaintiffs' case. Counts VII and VIII allege violations of the Illinois Consumer Fraud Act, 815 ILCS 505/2 *et seq.*

Defendant has filed a motion requesting that the Court grant summary judgment in Defendant's favor on Counts I, III, and VI, and that the Court decline to exercise supplemental jurisdiction over Counts V, VII, and VIII. For the reasons stated below, Defendant's motion is granted as to Counts I and VI, and is denied as to Counts III, V, VII, and VIII.

RELEVANT FACTS

Kwanza Hamilton remembers shopping for financing for the purchase of an automobile at only one place prior to March 15, 2001, Rizza Chevrolet ("Rizza"). (D.E. 35, Ex. A, at 23-24.) Rizza denied Kwanza's credit application. (*Id.* at 23.) Kwanza's mother, Deborah Hamilton, agreed to co-sign a loan with him through Rizza, but Kwanza did not like the terms Rizza offered. (*Id.* at 24; D.E. 43 at 4-5.)

On March 15, 2001, Ms. Hamilton and Kwanza went to O'Connor to purchase a car. (D.E. 43 at 2.) Ms. Hamilton testified at her deposition that she and Kwanza were told by an O'Connor salesperson that the 1996 Chrysler LHS they were considering purchasing was "privately owned." (D.E. 35, Ex. C,

Not Reported in F.Supp.2d, 2004 WL 1403711 (N.D.Ill.)

**(Cite as: 2004 WL 1403711 (N.D.Ill.))**

at 13.) Ms. Hamilton further testified that she understood this to mean that the car had only one previous owner. (*Id.* at 16.)[FN1]

> FN1. Plaintiffs did not include in their Local Rule 56.1(b)(3)(B) statement the facts regarding their being told that the car was "privately owned" and Ms. Hamilton understanding this to mean that the car had only one previous owner. Consequently, these facts are not properly before the Court. *See* Local Rule 56.1(b)(3)(B) (requiring that the statement of the party opposing summary judgment include "any additional facts that require the denial of summary judgment."). The Court will nonetheless assume that these facts are true for purposes of Defendant's motion; however, as explained below in the discussion of Count VI, the Odometer Act claim, doing so does not affect the Court's decision.

That same day, in relation to their purchase of the 1996 Chrysler LHS, Ms. Hamilton and Kwanza signed a retail installment contract with a financing rate of 12.75%. (D.E. 43 at 2; *see* D.E. 35, Ex. 1 to Ex. B, at 1.) Before the Hamiltons signed this contract, Ms. Hamilton said "maybe I should go some place else" to O'Connor representative Karen Zimmerman. (D.E. 35, Ex. C, at 30.) Ms. Zimmerman reportedly told Ms. Hamilton "[t]his is the best deal you're going to get here." (*Id.; see also id.* ("She [Ms. Zimmerman] said that was the best she could do.")).[FN2]

> FN2. At times Plaintiffs appear to contend that Ms. Zimmerman stated that the rate discussed with Plaintiffs was the best rate that Plaintiffs could get *anywhere.* The only support that Plaintiffs offer for this suggestion (in addition to the testimony of Ms. Hamilton, who testified that Ms. Zimmerman said that "[t]his is the best deal you're going to get *here"* (D.E. 35, Ex. C,

at 30 (emphasis added)), is Ms. Zimmerman's answers to a handful of hypothetical questions asked at her deposition about how she might answer certain customer inquiries. (See D.E. 44 (Pl.Resp.) at 9-10.) There is no indication from these hypothetical questions that Ms. Zimmerman ever represented to anyone that the rate Zimmerman was quoting was the best rate they could get *anywhere*-as opposed to at O'Connor, as Ms. Hamilton's testimony reflects. In addition, there is nothing in the quoted questions and answers that reflects that Ms. Zimmerman ever represented to Plaintiffs that O'Connor was quoting them the best rate they might be able to obtain *anywhere.* Ms. Hamilton's testimony appears to preclude any such understanding.

**\*2** In support of Plaintiffs' opposition to Defendant's summary judgment motion, Ms. Hamilton submitted a written certification. (D.E.43, Ex. 1.) In it, she states that she remembers signing a contract on March 15, 2001 with a financing rate of 11.75% and that she does not remember signing a contract with a 12.75% financing rate. (*Id.* at 3.) She further states that she must have signed two contracts on March 15, 2001 and that

The reason I did not see that I had signed a second contract for 12.75% was that when I was given documents to sign by Karen Zimmerman, they were kept in a stack. I was instructed to sign at the bottom of each piece of paper where only the signature line was visible. I never had the opportunity to look at the 12.75% 'voided' document that I signed and which was produced to my lawyers. Karen Zimmerman stood over me while she held onto the paperwork and showed me where to sign. The paperwork I signed on March 15, 2001 was never handed to me until after I had signed it and in fact, the 12.75% contract was *never* handed to me. I never knew that I had been obligated to a 12.75% contract until O'Connor took my

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1403711 (N.D.Ill.)

**(Cite as: 2004 WL 1403711 (N.D.Ill.))**

deposition."

(*Id.*) (emphasis in original). Defendant contends that Ms. Hamilton's certification should be disregarded because it contradicts Plaintiffs' earlier disclosures. (D.E. 48 at 4-8, citing, *inter alia, Patterson v. Chicago Ass'n for Retarded Citizens,* 150 F.3d 719 (7th Cir.1998)).

On March 15, 2001, GMAC sent O'Connor a fax stating that Ms. Hamilton and Kwanza were approved for financing at "Tier: B." (D.E. 43, Ex. 3, at 1.) On March 26, 2001, GMAC sent O'Connor a fax stating "Please send a check or new contract for the rate difference. B tier is 14.75%, Contract is 12.75. To buy down it is $845.40." (D.E. 43, Ex. 4, at 1.)

Sometime shortly after March 26, 2001 (roughly two weeks after March 15, 2001, and at least March 26, 2001), the Hamiltons returned to O'Connor and signed a retail installment contract with a financing rate of 15.75%. (D.E. 49 at 2-3.) This contract was dated March 15, 2001 even though it was executed approximately two weeks after that date. (*Id.*) Plaintiffs have not asserted that any O'Connor representative stood over them and held onto this retail installment contract or otherwise failed to give it to them in a form they could keep before they signed it.

O'Connor truthfully disclosed the mileage of the 1996 Chrysler to Plaintiffs on the "Application For Vehicle Title and Registration." (D.E. 43 at 7.) Plaintiffs do not challenge the accuracy of the odometer reading or contend that O'Connor tampered with the odometer in any way. (*Id.* at 7-8.) O'Connor apparently does not dispute that it did not show Plaintiffs the vehicle's title document. (D.E. 49 at 3 (statement by Defendant that "in deals such as the Hamiltons', where a vehicle is financed, the title is not given to the customer, it goes to the lien holder until the loan is paid.")) The title shows that the car had two prior owners. (D.E. 49 at 4.)

*3 Deborah Hamilton testified that, at some point after she and Kwanza purchased the car, she spoke to an O'Connor representative and was "complaining about the contract." (D.E. 35, Ex. C, at 85.) She told the representative, "I didn't want the car no more. We were tired of all the problems we were having with it. I told them I was not going to be paying Enterprise all this money for car rentals and paying a car note and pay insurance and then have a car sitting in the driveway and pay a car note. I said, that don't make sense." (*Id.* at 85-86.) She was told to speak to Sean Galvin, another O'Connor representative. (*Id.*) She told Mr. Galvin, "I want another car ... I want a car worth $25,000," (*id.* at 86), which is what she claims O'Connor said was the value of the 1996 Chrysler LHS. (*Id.*)

Ms. Hamilton testified that Mr. Galvin said that O'Connor would need to look at the car. (D.E. 35, Ex. C, at 86.) Ms. Hamilton further testified that she asked "but how [are] you going to have somebody look at [it] when they say it could be weeks or months before the car can be looked at because the garage is so backed up[?]" (*Id.* at 86-87.) According to Ms. Hamilton, Mr. Galvin said "well, since you are black, you get the black book price." (*Id.* at 87.) Ms. Hamilton took this to mean that "they're trying to tell me that I'm black and I'm lower than low, right, lower than dirt." (*Id.* at 92.)

O'Connor denies that Mr. Galvin made the "black book" statement. According to O'Connor, "[t]he Official Used Car Market Guide 'Black Book' is a periodical publication which contains listings of wholesale auction prices for used automobiles and trucks in multiple states." (D.E. 48 at 9.) Mr. Galvin testified that the Black Book is one source he uses in assessing the value of used cars. (D.E. 43, Ex. 7, at 81; *see also* D.E. 48 at 9.)

Plaintiffs filed their first complaint in this action on March 14, 2002. They filed a second complaint on April 23, 2002. (D.E. 34 at 4.) As Judge Lefkow previously found, neither of those complaints men-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1403711 (N.D.Ill.)
**(Cite as: 2004 WL 1403711 (N.D.Ill.))**

tioned that Plaintiffs returned to O'Connor after March 15, 2001 to sign another contract or asserted a claim based on backdating of a contract. (*Id.* at 6.) The first time the Plaintiffs raised such a claim was in Count II of their Second Amended Complaint, which they filed on August 5, 2003. (*Id.* at 4, 6.) On December 11, 2003, Judge Lefkow, on Defendant's motion, dismissed Count II of Plaintiff's Second Amended Complaint (as well as Count IV, an ECOA claim) on statute of limitations grounds. (D.E. 34 at 6-7.)

### LEGAL STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether there is a genuine factual issue, the court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette,* 359 F.3d 925, 928 (7th Cir.2004). To avoid summary judgment, the non-movant must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### DISCUSSION

A. Count I (TILA).

**\*4** Defendant has moved for summary judgment on Count I, which Defendant understands to be brought under 15 U.S.C. § 1638(b)(1). Defendant asserts, among other arguments, that Plaintiffs suffered no actual damages as a result of a violation of § 1638(b)(1), and that TILA allows for the recovery of only actual damages for violations of that section. (D.E. 35 at 4-6.) That section of TILA, § 1638(b)(1), as expressed in Regulation Z of the Board of Governors of the Federal Reserve System, 12 C.F.R. § 226.17, governs the form and timing of disclosures in that it mandates that certain disclosures be made in a form the consumer can keep, before credit is extended. *See Spearman v. Tom Wood Pontiac-GMC, Inc.,* 312 F.3d 848, 849-50 (7th Cir.2002). In Plaintiffs' response to Defendant's summary judgment motion ("Plaintiffs' Response"), Plaintiffs assert that "Count I of the Hamiltons' second amended complaint asserts two separate violations of the TILA. First, the Hamiltons allege that O'Connor Chevrolet violated 15 U.S.C. § 1638(b)(1) by failing to provide Plaintiffs with the required disclosures, in a form they could keep, before credit was extended. Second, the Hamiltons allege that O'Connor violated 15 U.S.C. § 1638(a)(4) by failing to accurately disclose the annual percentage rate." (D.E. 44 at 3) (footnotes omitted). The upshot of Plaintiffs' assertion that they have alleged in Count I not only a claim for a violation of the form and timing requirements of § 1638(b)(1), but also a claim for a violation of § 1638(a), which governs the content of disclosures, is that, in addition to contending that they can prove actual damages, Plaintiffs' assert that they are also entitled to statutory damages on their § 1638(a) claim. (D.E. 44 at 10.)

Defendant, on the other hand, maintains that Count I does not include a claim under § 1638(a) and that this claim was actually contained in Count II, which already was dismissed by Judge Lefkow. (D.E. 48 at 1-3.) Defendant, therefore, holds to its argument that summary judgment is warranted on Count I because Plaintiffs cannot prove actual damages resulting from a violation of § 1638(b)(1). As explained below, the Court finds that Defendant is entitled to summary judgment on Count I, based in part on Judge Lefkow's prior ruling in this case.

1. The claim under § 1638(a)(4)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1403711 (N.D.Ill.)

(Cite as: 2004 WL 1403711 (N.D.Ill.))

As described in Plaintiffs' Response, the basis of their claim in Count I under § 1638(a)(4) is that "O'Connor backdated the contract." (D.E. 44 at 7.) Plaintiffs explain more specifically that "the 15.75% retail installment contract dated March 15, 2001 was not executed on March 15, 2001. In fact, it was signed two weeks later. Therefore, the annual percentage rate was not 15.75%.... This entitles the Hamiltons to an award of statutory damages." (*Id.* at 7-8.) However, Count I of the Second Amended Complaint contains no reference to § 1638(a), (D.E.26, ¶¶ 43-53), which mandates certain disclosures, including the annual percentage rate ("APR"). *See* 15 U.S.C. § 1638(a)(4). Further, the only mention in Count I of backdating or the accuracy of the disclosed APR is the following sentence: "Additionally, as Defendant backdated the second retail installment contract, the APR was not accurately disclosed, as set forth in Count II below." (*Id.,* ¶ 53.) As reflected by this sentence, it is Count II (that is, the count dismissed by Judge Lefkow) which was brought under § 1638(a) and was based on the theory that "[b]y calculating the APR as of March 15, 2001, rather than from the date on which the second contract was signed, O'Connor disclosed the incorrect APR to the Hamiltons, in violation of the TILA." (*Id.,* ¶ 65; *see also id.,* ¶ 64.) Because Count I does not assert a claim under § 1638(a), the damages provisions of TILA pertaining to that section are therefore not applicable to Count I.

**\*5** Moreover, Judge Lefkow already dismissed Count II, which contained Plaintiffs' claim for Defendant's alleged failure-as a result of the alleged backdating of a retail installment contract-to accurately disclose the APR in violation of § 1638(a). Indeed, Judge Lefkow specifically noted in her opinion that Count II of the Second Amended Complaint "raises for the first time the allegation that O'Connor violated the TILA when it consummated second or third retail installment contracts with its customers and then backdated those contracts," and Judge Lefkow also ruled that claims based on these

"new factual allegations" were time-barred. (D.E. 34 at 7; *see also id.* at 5-8.) Thus, because Plaintiffs' claim for violations of § 1638(a) has already been dismissed, Plaintiffs cannot rely on the statutory damages available for violations of that section but must instead meet the requirements for recovery under § 1638(b)(1).

2. The claim under § 1638(b)(1)

Plaintiffs do not dispute that, under Seventh Circuit precedent, *see Brown v. Payday Check Advance, Inc.,* 202 F.3d 987, 991-92 (7th Cir.2000), statutory damages are not available under TILA for violations of § 1638(b)(1). (*See* D.E. 44 at 8.) For violations of § 1638(b)(1), a consumer may recover only "any actual damage sustained by such person as a result of the failure." 15 U.S.C. § 1640(a)(1); *accord Brown,* 202 F.3d at 990. As mentioned above, § 1638(b)(1), as expressed in Regulation Z of the Board of Governors of the Federal Reserve System, 12 C.F.R. § 226.17, mandates that certain disclosures be made in a form the consumer can keep, before credit is extended. *See Spearman v. Tom Wood Pontiac-GMC, Inc.,* 312 F.3d 848, 850 (7th Cir.2002). In this regard, the Seventh Circuit has explained that "the creditor may fulfill the timing requirements of TILA and Regulation Z by providing the consumer with a copy of a contract containing the appropriate disclosures moments before the consumer signs the contract." *Id.* at 851.

Putting aside Defendant's objection to Ms. Hamilton's certification and viewing the facts in the light most favorable to Plaintiffs, insofar as Ms. Hamilton has stated in her certification that Ms. Hamilton held onto the contracts Ms Hamilton signed on March 15, 2001 until after Ms. Hamilton signed them, Plaintiffs have raised an issue of fact as to whether O'Connor failed to provide Plaintiffs with copies of the retail installment contracts signed on March 15, 2001 (which have APRs of 11.75% and 12.75%) in a form the Plaintiffs could

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

keep before Plaintiffs signed those contracts. However, Plaintiffs have not asserted that any O'Connor representative held onto the 15.75% retail installment contract or otherwise failed to give it to them in a form Plaintiffs could keep before they signed it. Thus, as to Plaintiffs' alleged actual damages under § 1638(b)(1), the pertinent question is whether Plaintiffs have raised a genuine issue of material fact as to whether they were damaged as a result of O'Connor's failure to provide Plaintiffs copies of the 11.75% and 12.75% contracts in a form they could keep before Plaintiffs signed them on March 15, 2001.

*6 To show actual damages, Plaintiffs must present evidence that they were "effectively prevented from obtaining better credit terms elsewhere." *Nevarez v. O'Connor Chevrolet, Inc.,* 303 F.Supp.2d 927, 934 (N.D.Ill.2004) (internal quotation omitted); *accord, e.g., Anderson v. Rizza Chevrolet, Inc.,* 9 F.Supp.2d 908, 913 (N.D.Ill.1998) (collecting cases and holding that plaintiff must show that "but for the misrepresentation better credit terms would have been secured"); *Balderos v. Illinois Vehicle Premium Finance Co.,* No. 96-8050, 1997 WL 627650 at *6 (N.D.Ill. Oct.2, 1997) (collecting cases and stating, "[to prove actual damages in a TILA case, each class member would have to prove that but for the violation, he would have obtained credit on more favorable terms elsewhere."). Ms. Hamilton testified that, before she signed the contracts on March 15, 2001, she said "maybe I should go some place else" to Ms. Zimmerman, (D.E. 35 at Ex. C at 30), but Plaintiffs have presented no evidence that they would have obtained financing at a rate better than 11.75% or 12.75% elsewhere. Precedent teaches that such evidence is insufficient to avoid summary judgment. *See, e.g., Nevarez,* 303 F.Supp.2d at 934 (to demonstrate actual damages, plaintiffs must show not only that "they would have sought a different warranty or lower price" but also that "they would have obtained another warranty or a lesser price"); *Anderson,* 9 F.Supp.2d at 913

(same); *Balkers,* 1997 WL 627650 at *6 (similar); *Graham v. R.R., LLC,* 202 F.Supp.2d 483, 488 (E.D.Va.2002) ( "Graham has not provided any evidence of actual damages. The only possible claim Graham has of actual damages is that he could have secured a lower rate of 8% but for signing RISC # 2 with an 11.5% interest (or RISC # 1 at 12%). But Graham provides no evidence that he could have acquired such a rate in January or February 2001.") (emphasis omitted).

Plaintiffs' contention that O'Connor's failure to provide the 11.75% and 12.75% contracts in a form Plaintiffs could keep before they signed them resulted in damage to Plaintiffs because by signing these contracts they became obligated to a rate of 15.75% (while GMAC approved them at 14.75%), (D.E. 44 at 4-5), is without merit. The foundation of this argument, that at the time Plaintiffs signed the 11.75% and 12.75% contracts on March 15, 2001, they became obligated on the 15.75% contract they signed two weeks later, has been rejected by the Seventh Circuit. *See Janikowski v. Lynch Ford, Inc.,* 210 F.3d 765, 767 (7th Cir.2000). In *Janikowski,* the plaintiff signed one contract with a 5.9% APR, was denied financing, and then signed another contract with an 11.9% APR the next day. *See id.* at 766-67. The plaintiff argued "that Lynch Ford violated TILA because, although Lynch Ford disclosed an APR of 5.9%, she was ultimately required to pay an APR of 11.9%." *Id.* at 767. In rejecting this argument, the Seventh Circuit explained that by signing the 5.9% contract, the plaintiff "was not legally obligated to purchase the Escort at any rate other than 5.9%." *Id.* The plaintiff did not become obligated on the 11.9% contract until she signed the contract containing that finance term. *Id.*

*7 So too, the Hamiltons did not become obligated to the 15.75% financing arrangement by virtue of signing the 11.75% and 12.75% contracts on March 15, 2001.[FN3] Therefore, although O'Connor's alleged failure to provide the 11.75% and 12.75% contracts to Plaintiffs in a form they could keep be-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1403711 (N.D.Ill.)
**(Cite as: 2004 WL 1403711 (N.D.Ill.))**

fore they signed them on March 15, 2001 may have resulted in Plaintiffs signing the 11.75% and 12.75% contracts, it did not cause Plaintiffs to be obligated on the 15.75% financing arrangement.[FN4] Thus, Plaintiffs' obligation on the 15.75% financing arrangement cannot serve as a basis for damages on Plaintiffs' claim in Count I. Because Plaintiffs have not presented evidence that they suffered actual damages from any alleged violation of § 1638(b)(1), Defendant's summary judgment motion is granted on Count I.

> FN3. Plaintiffs may be correct insofar as they are arguing that they became contractually bound when they signed the 11.75% and 12.75% contracts on March 15, 2001. (D.E. 44 at 4-5.) As explained above, however, Plaintiffs did not become obligated on the 15.75% arrangement until they signed the contract containing those terms two weeks after March 15, 2001. *See generally Spearman v. Tom Wood Pontiac-GMC, Inc.,* 312 F.3d 848, 851 (7th Cir.2002) (teaching that TILA does not impose a generalized duty of a lender to explain a borrower's legal rights to him or her). The Court notes that Defendant's victory on Count I may be a pyrrhic one: Plaintiffs at least appear to believe that the sales in any event will give rise to liability under Illinois law. (See D.E. 44 at 4 & n. 11 (discussing 815 ILCS 505/2C).) The Court need not resolve this issue at the present time, because liability under that statute is not raised by the motion *sub judice,* and because Defendant has not had an opportunity to be heard on the issue.

> FN4. Similar to the case in *Janikowski,* Defendant's retail installment contracts expressly stated that by agreeing to the contract, the consumer was only agreeing to buy the vehicle in question "under the agreements on the front and back of the

contract" (D.E. 43, Ex. 5, at 1), including the various financing terms expressly set forth in a separate section of the GMAC form entitled "Federal Truth-in-Lending Disclosures." (*Id.*) In *Janikowski,* the contracts in question indicated that if financing could not be obtained within five days "according to the proposals in the retail installment contract," then either the seller or purchaser could cancel the contract. *Id.,* 210 F.3d at 766. *Janikowski* also rejected the claim that the defendant there failed to disclose that the quoted financing terms were merely estimates, *id.; Janikowski* instead found that the quoted lower rate "*was* the contractual rate, albeit a condition to the parties' duty to perform." *Id.* at 768 (emphasis in original).

## B. Count III (ECOA).

The ECOA provides, in pertinent part, that "[i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction ... on the basis of race...." 15 U.S.C. § 1691(a). Defendant argues that the alleged statement by Mr. Galvin, its representative, to Ms. Hamilton, that "well, since you are black, you get the black book price," (D.E. 35, Ex. C, at 87), cannot form the basis of a violation of the ECOA because the undisputed facts show that the statement was not discriminatory and that it was not made during a credit transaction. The Court disagrees.

According to Defendant, because it is undisputed that the Black Book is "a periodical publication which contains listings of wholesale auction prices for used automobiles and trucks in multiple states" and "Sean Galvin testified that he would use the 'Black Book' as one source in assessing the value of used cars .... the undisputed facts in the record make clear that the phrase 'Black Book' is not a racially derogatory term...." (D.E. 48 at 8-9.) To be

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1403711 (N.D.Ill.)

**(Cite as: 2004 WL 1403711 (N.D.Ill.))**

sure, the term "Black Book" may not be racially derogatory in every instance or every context in which it is used. However, a reasonable inference that can be drawn from the statement "since you are black, you get the black book price" is that Plaintiffs would be given the wholesale auction price, rather than a higher one, because of their race. If that is actually the case, then Plaintiffs were discriminated against on the basis of their race. In fact, Defendant appears to acknowledge that the "Black Book" statement can reasonably be interpreted in this fashion inasmuch as Defendant "vigorously contests" making the statement and describes it as "reprehensible and outrageous." (D.E. 48 at 10.)

Given that the issue of whether Defendant discriminated against Plaintiffs is a disputed factual question, the next matter for the Court to address is whether, as Defendant contends, the undisputed facts establish that any such discrimination did not occur during a "credit transaction" as that term is defined for purposes of the ECOA. Defendant argues that the record demonstrates that any such discrimination did not occur during a credit transaction because the "Black Book" statement was made "weeks after the retail installment contract was signed and the underlying loan was assigned to GMAC as lienholder." (D.E. 48 at 10.)

**\*8** The parties have not cited any cases they believe are analogous, and the Court has not found any that are particularly helpful either. Nonetheless, the term "Credit transaction" in the ECOA has been defined broadly by the Board of Governors of the Federal Reserve System to include events that occur after credit is extended:

Credit transaction means every aspect of an applicant's dealings with a creditor regarding an application for credit or an existing extension of credit (including, but not limited to, information requirements; investigation procedures; standards of creditworthiness; terms of credit; furnishing of

credit information; revocation, *alteration*, or *termination of credit;* and collection procedures).

12 C.F.R. § 202.2(m) (emphases added).[FN5] Furthermore, while it is not clear exactly what outcome Ms. Hamilton intended to initiate when she spoke to O'Connor "complaining about the contract," (D.E. 35, Ex. C, at 85), it appears that she may have been seeking to alter or terminate her credit arrangement. More specifically, because she told O'Connor "I didn't want the car no more" and that it didn't "make sense" for her to continue paying the car note given all the problems with the car, (*id.* at 85-86), a reasonable inference that can be drawn is that one option Ms. Hamilton was pursuing was to trade-in the car in exchange for forgiveness on her loan, which would result in either an alteration or possibly a termination of her credit. *See generally Thele v. Sunrise Chevrolet,* No. 03-2626, 2004 WL 1194751 at \*5 (N.D.Ill. May 28, 2004) ("[plaintiff] returned the Envoy as consideration for forgiveness-which she received-of the final five or six months of payments left on her Envoy.") Whether Defendant, in the same way it helped arrange financing for Plaintiffs with GMAC, could also arrange for forgiveness to be granted Plaintiffs in exchange for the trade-in (or effect some other alteration of the business arrangement) is also a factual question not resolved by the current record. In sum, because a creditor's dealings with an applicant regarding alteration or termination of credit are within the definition of "Credit transaction," and because there is factual ambiguity concerning whether, *inter alia,* Ms. Hamilton was seeking to alter or terminate her credit arrangement when she was allegedly told by Defendant "since you are black, you get the black book price," Defendant's motion for summary judgment as to Count III is denied.

> FN5. Defendant has not disputed that it is "creditor" and that each plaintiff is an "applicant" for purposes of the ECOA. (D.E. 48 at 8-11; D.E. 35 at 6-8.)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1403711 (N.D.Ill.)

**(Cite as: 2004 WL 1403711 (N.D.Ill.))**

**C. Count VI (Odometer Act).**

The Odometer Act [FN6] requires car dealers to disclose to purchasers "the cumulative mileage registered by the odometer" in the manner prescribed by regulations issued by the Secretary of Transportation. 49 U.S.C. 32705(a). The applicable regulations provide that, with certain exceptions, car dealers must disclose the odometer reading on the vehicle's certificate of title. *See* 49 C.F.R. § 580.5(c). Civil liability attaches under the Odometer Act only where the plaintiff can prove both that the defendant violated the Act and also that the violation was done "with intent to defraud." 49 U.S.C. § 32710(a). Defendant contends that, even assuming that it did not comply with the Act because it accurately disclosed the vehicle's mileage on the Application for Vehicle Title and Registration rather than on the title itself, Plaintiffs still cannot establish liability. Defendants, citing considerable case law in support, contend that Plaintiffs cannot prevail on their Odometer Act claim, in that Plaintiffs cannot prove the requisite intent to defraud because Plaintiffs admittedly are not challenging the accuracy of the disclosed odometer reading or asserting that O'Connor tampered with the odometer in any way. In response, Plaintiffs argue that they are not required to show an intent to defraud with respect to the vehicle's mileage and that they have done enough by presenting evidence that Defendant allegedly represented that the car had one owner [FN7] while the title shows that the car perhaps had at least two owners. Joining with the majority of courts that have considered the issue, the Court holds that Defendant is entitled to summary judgment on the Odometer Act claim because Plaintiffs have presented no evidence that Defendant intended to defraud them with respect to the car's mileage or its odometer reading.

> FN6. Plaintiffs incorrectly describe the statute they are seeking relief under in Count VI as the "Motor Vehicle and Information Cost Savings Act." (D.E. 44 at

12.) The "Motor Vehicle Information and Cost Savings Act," which was codified at 15 U.S.C. §§ 1981-1991, was repealed by Pub.L. No. 103-272, § 7(b), 108 Stat. 1379 (1994). Its successor, the statute at issue in Count VI, 49 U.S.C. § 32701 *et seq.*, is located in Chapter 32 of Title 49 of the United States Code, which is titled "Odometers." Accordingly, this statute is properly referred to as the "Odometer Act." *Szwebel v.. Pap's Auto Sales, Inc.,* No. 02-7797, 2003 WL 21750841 at *2 (N.D.Ill. July 29, 2003) ("Presuming that the Szwebels intended to assert a claim under the Federal Odometer Act, 49 U.S.C. § 32701 *et seq.*, rather than the repealed Motor Vehicle Information and Cost Saving Act, 15 U.S.C. § 1981 *et seq.....*").

> FN7. For purposes of this motion, the Court will assume that Defendant represented that the car had one owner by stating that it was "privately owned." (D.E. 35, Ex. C, at 13.)

**\*9** Congress has stated that the Odometer Act has two purposes: "(1) to prohibit tampering with motor vehicle odometers; and (2) to provide safeguards to protect purchasers in the sale of motor vehicles with altered or reset odometers." 49 U.S.C. § 32701; *accord Compton v. Altavista Motors, Inc.,* 121 F.Supp.2d 932, 942 (W.D.Va.2000); *Edlund v. Ridgedale Automotive, Inc.,* No. CIV. 001478ADMAJB, 2001 WL 877577 at *3 (D.Minn. Aug.1, 2001). In keeping with the express purposes of the Act (and its predecessor), a line of cases dating back more than twenty-five years holds that civil liability under the Odometer Act is limited to mileage fraud and odometer tampering. *See Ransom v. Rohr-Gurnee Volkswagen, Inc.,* No. 01-2137, 2001 WL 141297 at *2 (N.D.Ill. Oct. 15, 2001) (Zagel, J.) ("[Plaintiff] cannot maintain an action under the Odometer Act where she makes no allegation of odometer tampering."); *accord Locascio v.*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1403711 (N.D.Ill.)

**(Cite as: 2004 WL 1403711 (N.D.Ill.))**

*Imports Unlimited, Inc.,* 309 F.Supp.2d 267, 270-71 (D.Conn.2004); *Mayberry v. Ememessay, Inc.,* 201 F.Supp.2d 687, 695-96 (W.D.Va.2002); *Edlund,* 2001 WL 877577 at ----3-4; *Compton,* 121 F.Supp.2d 932, 941-42; *Michael v. Ferris Auto Sales,* 650 F.Supp. 975, 977 (D.Del.1987); *Purser v. Bill Campbell Porsche Audi, Inc.,* 431 F.Supp. 1235, 1237 (N.D.Fla.1977). As explained by several of these courts, "[a] contrary holding would ascribe to Congress the unlikely, and unsupported, intent of allowing the Odometer Act to serve as a vehicle for plaintiffs to bring numerous state-law claims into federal court, simply because the claims concern defects in an automobile's certificate of title." *Locascio,* 309 F.Supp.2d at 270-71; *accord Mayberry,* 201 F.Supp.2d at 695-96 ("To hold otherwise would expand the meaning of the Federal Odometer Act so that almost any state-law claim for fraud [implicating a car sale] would also be a violation of federal law. Even the idea that there can be a 'non-mileage violation' of an act whose central purpose is to ensure the accurate reporting of mileage strains credulity."); *Compton,* 121 F.Supp.2d at 941 & n. 4 (holding that "[t]o interpret the 'intent to defraud' provision as ... [plaintiff] does could lead to the federalization of a 'large segment of common law fraud,' which is certainly not consistent with the stated purposes of the Odometer Act.") (quoting *Michael,* 650 F.Supp. at 977).

In this vein, numerous cases have rejected attempts to use the Odometer Act as a more generalized car-sale-fraud statute in instances where the allegations did not reflect any intent to defraud concerning the car's mileage or any allegation of odometer tampering. *See, e.g., Locascio,* 309 F.Supp.2d at 270-71 (rejecting claim concerning whether car had been salvaged and whether such information was reflected on car title, where mileage was accurately disclosed); *Compton,* 121 F.Supp.2d at 941-42 & n. 4 (rejecting claim concerning alleged fraud concerning time when ownership of vehicle actually was transferred via title and other transaction document-

ation); *Edmund,* 2001 WL 877577 at *3 (rejecting claim concerning whether seller accurately disclosed car's accident history); *Michael,* 650 F.Supp. at 977 (rejecting claim concerning whether seller had disclosed that certain engine parts that tend to wear with mileage had been replaced with even older parts, and stating that a contrary interpretation would invite litigants to invoke a "federal treble damages remedy whenever a transferor fails to disclose that any one of the many vehicle components that tend to depreciate with mileage has been replaced with an older part").

*10 In the only two decisions this Court has located which have held that a general intent to defraud (that is, an alleged intent to defraud unrelated to the car's mileage or any other allegation of odometer tampering) is sufficient under the Act- *Salmeron v. Highlands Ford Sales, Inc.,* 223 F.Supp.2d 1238 (D.N.M.2002), and *Yazzie v. Amigo Chevrolet, Inc.,* 189 F.Supp.2d 1245 (D.N.M.2001)-the courts did not mention the above line of authority and do not appear to have considered it. In both *Salmeron* and *Yazzie,* the courts based their decision that the Odometer Act is intended to remedy more than mileage fraud on the fact that " 'the Act's regulations specifically require that a certificate of title signed by the transferor be the primary means of providing odometer information ....and supplying a purchaser or transferee of a motor vehicle with *any* kind of a written statement of an odometer's reading, regardless of its accuracy, does not constitute compliance." ' *Salmeron,* 223 F.Supp.2d at 1243 (quoting *Yazzie,* 189 F.Supp.2d at 1247-48) (emphasis in *Yazzie* ).[FN8]

> FN8. These cases have been criticized and/or expressly rejected in some of the cases cited above. *See Locascio v. Imports Unlimited, Inc.,* 309 F.Supp.2d 267, 270 (D.Conn.2004) (rejecting *Salmeron* and *Yazzie* "general intent" approach); *Mayberry v. Ememessay, Inc.,* 201 F.Supp.2d 687, 695 & n. 1 (W.D.Va.2002) (rejecting

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1403711 (N.D.Ill.)
**(Cite as: 2004 WL 1403711 (N.D.Ill.))**

reasoning of *Yazzie,* and citing *Compton v. Altavista Motors, Inc.,* 121 F.Supp.2d 932 (W.D.Va.2000), in support).

Consistent with the fact that Congress expressly identified the purposes of the Act to be the prohibition of odometer tampering and the provision of safeguards to protect purchasers from buying cars with altered or reset odometers, the Court sides with the weight of authority and finds that summary judgment is appropriate as to Count VI because the Plaintiffs have made no showing of intent to defraud concerning the car's mileage or any allegation whatsoever of odometer tampering. (Indeed, the Plaintiffs concede that the mileage was accurately disclosed, and they also expressly acknowledge that they do not allege odometer tampering (D.E. 43 at 7-8.)) *See Mayberry,* 201 F.Supp.2d at 695 (while plaintiff might have "a claim for common-law fraud or other similar state claims," "Plaintiff cannot maintain a cause of action" under the Odometer Act "without evidence of intent to defraud as it relates to the purposes of the Act."); *accord, e.g., Locascio,* 309 F.Supp.2d at 270 (requiring intent to defraud concerning purposes of the Odometer Act). Defendant's summary judgment motion is granted as to Count VI.

**D. Counts V, VII, and VIII (Magnuson-Moss and State Law Counts).**

Defendant's sole argument in support of dismissing Counts V, VII, and VIII is that because all of the counts that independently confer federal subject matter jurisdiction (that is, Counts I, III, and IV) should be dismissed pursuant to Fed.R.Civ.P. 56, the Court should decline to exercise jurisdiction over the supplemental claims (Counts V, VII, and VIII).[FN9] Because Count III (the ECOA claim) was not dismissed, Defendants' argument is inapplicable on its own terms. Accordingly, the Court declines to dismiss Counts V, VII, and VIII.

FN9. As previously explained, the parties do not dispute that, on the facts of this case, Plaintiffs' Magnuson-Moss claim does not confer federal subject matter jurisdiction because of the relatively small amount of money at issue in Plaintiffs' case. *See generally Gardynski-Leschuck v. Ford Motor Company,* 142 F.3d 955, 959 (7th Cir.1998).

CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted as to Counts I and VI, and denied as to Counts III, V, VII, and VIII.

N.D.Ill.,2004.
Hamilton v. O'Connor Chevrolet, Inc.
Not Reported in F.Supp.2d, 2004 WL 1403711 (N.D.Ill.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4245409 (W.D.Mich.)
(Cite as: 2007 WL 4245409 (W.D.Mich.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
W.D. Michigan,
Southern Division.
Roy F. **GREENLAND**, Plaintiff,
v.
**VAN RU** CREDIT CORPORATION, California
Student Aid Commission, Eaton Rapids Public
Schools, United States Department of Education,
and United States Department of Treasury, Defendants.
No. 5:06-cv-2.

Nov. 29, 2007.

Daniel L. Kraft, Kraft Law Firm, Lansing, MI, for
Plaintiff.

Henry L. Gordon, Steven B. Galbraith, Galbraith
Gordon & Penzien, PC, Detroit, MI, Boyd William
Gentry, Jeffrey Charles Turner, Surdyk Dowd &
Turner Co., LPA, Dayton, OH, W. Francesca Ferguson, U.S. Attorney, Grand Rapids, MI, for Defendants.

*OPINION AND ORDER*

WENDELL A. MILES, Senior District Judge.

**\*1** This matter is before the court on (1) a Motion
to Dismiss or Alternatively, Motion for Summary
Judgment filed by the United States Department of
Education (docket # 48), and (2) Motion for Summary Judgment filed by Van Ru Credit Corporation
and California Student Aid Commission (docket #
50). For the reasons that follow, the court grants
both motions.

Plaintiff filed this suit alleging violations of the
Fair Debt Collection Practices Act (FDCPA), 15
U.S.C. § 1692, and Michigan state law. The defendants in this case include the United States Department of Education (USDOE), California Student
Aid Commission (CSAC), and Van Ru Credit Corporation (Van Ru).[FN1] CSAC is a guaranty agency
responsible for administering financial aid programs for students. CSAC functions as one of the
guaranty agencies for the Federal Family Education
Loan Program on behalf of the Department of Education. Van Ru is one of several private collection
agencies retained by the Department of Education
to collect defaulted student loans. Van Ru was retained by EdFund, CSAC's auxiliary provider, to
collect Plaintiff's defaulted student loans.

> FN1. Plaintiff's employer, Eaton Rapids
> School District, was dismissed without
> prejudice on March 31, 2006, (docket #
> 15), and the United States Department of
> Treasury was dismissed as a defendant on
> October 10, 2006. (Docket # 43).

*Background*

For some number of years through and including
1983, Plaintiff received student loans through Marine Bank of Buffalo, New York and American Education Services of Harrisburg, Pennsylvania. The
loans were guaranteed by the USDOE. Plaintiff apparently made the required payments for several
years. However, on February 22,1988, he filed for
Chapter 7 bankruptcy relief, owing Marine Midland
Bank $25,191.60, and American Education Services $6,857.03. After he was granted a discharge
in the bankruptcy proceeding on June 7, 1988, he
made no further payments on the student loans.[FN2]

> FN2. Plaintiff does not contend that his
> student loans were discharged pursuant to
> 11 U.S.C. § 523a(8)(B), which permits the
> bankruptcy court to discharge a student
> loan not otherwise dischargeable if
> "excepting such a debt from discharge ...
> will impose undue hardship on the debtor

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4245409 (W.D.Mich.)
**(Cite as: 2007 WL 4245409 (W.D.Mich.))**

and the debtor's dependents."

Plaintiff received a letter from Van Ru dated February 28, 2005, advising that it was a debt collector attempting to collect a debt in the amount of $11,059.78, and identifying the creditor as Edfund. (Amend.Comp., Ex. 1). Later, Plaintiff received a "Notice Prior to Wage Withholding" from the CSAC dated March 7, 2005, stating that his wages would be garnished unless he took action to pay his defaulted student loans, and indicating that the amount owed was $11,067.47. The notice informed Plaintiff that he must make arrangements for payment with Van Ru. (Amend.Comp.Ex. 2). Plaintiff's employer received an "Order of Withholding From Earnings" dated May 12, 2005, printed on CSAC stationery. The Order directed Plaintiff's employer to pay all amounts withheld from Plaintiff's salary to Van Ru. Although the order was not signed, the final sentence of the document stated, "Agent for California Student Aid Commission: Van Ru Credit Corporation." (Amend.Compl.Ex. 3). Plaintiff's employer garnished Plaintiff's wages and forwarded payments to Van Ru.

Plaintiff received a document dated August 12, 2005, from the CSAC stating that the Department of Education "holds a claim against you for defaulted student loan(s) which it intends to collect by offset." The amount owed was shown as $8,738.01. For a current balance and repayment options, Plaintiff was directed to contact Van Ru; for a request for documents or a hearing, Plaintiff was directed to contact Edfund. (Amend.Compl.Ex. 4). By letter dated September 23, 2005, the internal collections unit of the CSAC informed Plaintiff that "Edfund, the California Student Aid Commission's auxiliary services provider" had assigned Plaintiff's defaulted student loans to Van Ru, and that all further communications should be with Van Ru. (Amend.Compl.Ex. 5). Van Ru sent Plaintiff a letter dated November 7, 2005, advising that it was a debt collector and was attempting to collect a debt on behalf of creditor Edfund. (Amend.Compl.Ex. 6). Finally, Plaintiff received a communication

from the United States Department of the Treasury advising that it had applied all or part of Plaintiff's tax refund to a debt owed to the Department of Education, care of Edfund, a service of the CSAC. (Amend.Compl.Ex. 7).

**\*2** Plaintiff filed the present action, asserting the following four claims:

(1) attempts to collect Plaintiff's student loan debt by Van Ru Credit Corporation and California Student Aid Commission are barred by Michigan's statute of limitations, MCL 600.5809(8), and equitable laches, MCL (Amend.Compl.18, 19);

(2) the forms used by Defendants are prohibited by Michigan's Regulation of Collection Practices (MRCP), MCL § 445.252, and the Fair Debt Collection Act (FDCPA), 15 U.S.C. § 1692 (Amend.Compl.# 20);

(3) Van Ru claims to have authority to garnish Plaintiff's wages in violation of MRCP, § 445.252 and the FDCPA, §§ 1692(f) and (j) (Amend.Compl.# 22); and finally,

(4) the garnishment of Plaintiff's wages and the offsetting of his tax return constitute unlawful conversions (Amend.Compl.23-26).

Plaintiff seeks an order enjoining any further wage garnishments or withholding of tax refunds, and damages equal to the amount garnished from his wages and offset from his tax refund. Plaintiff bases the court's jurisdiction over this matter on 28 U.S.C. §§ 1331 and 1441, and 15 U.S.C. § 1692k(d). Defendant USDOE brings its motion under Federal Rules of Civil Procedure 12(b)(1) and 56, arguing that the court lacks subject matter jurisdiction over this action, but even assuming jurisdiction, the complaint fails to state a claim against the USDOE. Van Ru brings its motion for summary judgment under Rule 56.

**I. UNITED STATES DEPARTMENT OF EDU-**

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4245409 (W.D.Mich.)
**(Cite as: 2007 WL 4245409 (W.D.Mich.))**

*CATION*

*Subject matter jurisdiction*

Federal Rule of Civil Procedure 12(b)(1) provides that a party may make a motion for dismissal based on lack of subject matter jurisdiction. A motion to dismiss under Rule 12(b)(1) may either attack the claim of jurisdiction on its face or attack the factual basis of jurisdiction. *Golden v. Gorno Bros., Inc.,* 410 F.3d 879, 881 (6th Cir.2005); *DXL, Inc. v. Kentucky,* 381 F.3d 511, 516 (6th Cir.2004). The US-DOE's motion presents a facial challenge to jurisdiction.

Where the defendant mounts a facial attack on subject matter jurisdiction, the court must take the allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *U.S. v. A.D. Roe Co., Inc.,* 186 F.3d 717, 721-22 (6th Cir.1999). Thus, the standard of review of a facial attack on jurisdiction is similar to that employed for a motion to dismiss under Rule 12(b)(6). *DXL,* 381 F.3d at 516. However, when the defendant challenges subject matter jurisdiction by a motion to dismiss under Rule 12(b)(6), the plaintiff bears the burden of establishing that the court has subject matter jurisdiction over the claims. *Hedgepeth v. Tennessee,* 215 F.3d 608, 611 (6th Cir.2000) ; *Whittle v. U.S.,* 7 F.3d 1259, 1262 (6th Cir.1993).

Plaintiff has not met his burden of establishing that the court has subject matter over his claims against the USDOE. The doctrine of sovereign immunity bars an individual from suing the United States without its consent. *See United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) ("It is elementary that '[the] United States as sovereign, is immune from suit save as it consents to be sued ..., and terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit,' " *quoting United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941). "Sovereign immunity is a jurisdictional bar, and a

'waiver of sovereign immunity is to be construed strictly and limited to its express terms.' " *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), *quoting United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969). A waiver of sovereign immunity cannot be implied but must be unequivocally expressed. *Lane v. Pena,* 518 U.S. 187, 192, 116 S.Ct. 2092, 2096, 135 L.Ed.2d 486 (1996) (citations omitted). In the absence of such a waiver, "sovereign immunity shields the Federal Government and its agencies from suit." *Dorking Genetics v. United States,* 76 F.3d 1261, 1263 (2d Cir.1996), citing *FDIC v. Meyer,* 510 471, 475, 510 U.S. 471, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). Not withstanding that the United States is not a named party here, "a suit is against the sovereign if "the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration ... or if the effect of the judgment would be to restrain the government from acting, or to compel it to act." *Dugan v. Rank,* 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963) (citations omitted); *and see Whittle v. United States,* 7 F.3d 1259, 1262 (6th Cir.1993).

**\*3** Plaintiff's reliance on 28 U.S.C. §§ 1331 and 1441, and 15 U.S.C. § 1692k(d) as establishing the United States's waiver of sovereign immunity is unavailing. Title 28 U.S.C. § 1331 provides the district courts with "original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States." The statute is the general jurisdictional statute for federal questions, but is not a waiver of sovereign immunity. *Whittle,* 7 F.3d at 1262. Neither the federal question statute nor the Constitution operate in and of themselves as a waiver of sovereign immunity. *Doe v. Civiletti,* 635 F.2d 88, 94 (2d Cir.1980); *Garcia v. United States,* 666 F.2d 960, 966 (5th Cir.1982); *Jaffee v. United States,* 592 F.2d 712, 715-18 (3d Cir.1979); *and see United States v. Nordic Village, Inc.,* 503 U.S. 30, 37-38, 112 S.Ct. 1011, 1016, 117 L.Ed.2d 181 (1992) (rejecting argument that sovereign's exposure to suit is not governed by specific statutory lan-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4245409 (W.D.Mich.)
**(Cite as: 2007 WL 4245409 (W.D.Mich.))**

guage but may be concealed in a "broad jurisdictional grant").[FN3]

> FN3. Although not invoked by Plaintiff, 28 U.S.C. § 1332, which governs diversity actions, likewise does not waive the United States' sovereign immunity. *See Nishibayaski v. England,* 360 F.Supp.2d 1095, 1101 (D.Haw.2005) ("[B]ecause section 1332 is not in itself a waiver of sovereign immunity, Plaintiff must demonstrate that the claim being asserted is covered by a specific statutory authorization to sue the United States").

Section 1441 of Title 28 is the federal removal statute that authorizes a defendant to remove "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." 28 U.S.C. § 1441(a). Because this case is not a removal action, section 1441 simply does not apply.

As his third basis for jurisdiction, Plaintiff invokes 15 U.S.C. § 1692k(d). This provision of the FDCPA permits actions under the statute to be brought "in any appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction [.]" 15 U.S.C. § 1692k(d). However, section 1692a(6)(c) of the FDCPA expressly provides that the term "debt collector" excludes "any officer or employee of the United States or any State to the extent that collecting or attempting to collect any debt is in the performance of his official duties." 15 U.S.C. § 1692a(6)(c). Accordingly, section 1692k(d) clearly cannot be construed as an express waiver of sovereign immunity.

Although Plaintiff has asserted state law claims including the tort of conversion, these do not provide a basis for jurisdiction over the USDOE. The Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 *et seq.,* provides a limited waiver of the United States sovereign immunity for certain state tort actions. However, the FTCA does not authorize suits against a federal agency in its own name. *See* 28 U.S.C. § 2679(a) ("The authority of any federal agency to sue and be sued in its own name shall not be construed to authorize suits against such federal agency on claims which are cognizable under section 1346(b) ..."). The United States is the only proper defendant in an action under the FTCA, and, therefore, "[f]ailure to name the United States as a defendant in an FTCA suit results in a fatal lack of jurisdiction." *Allgeier v. United States,* 909 F.2d 869, 871 (6th Cir.1990); *and see F.D .I.C. v. Meyer,* 510 U.S. 471, 476-77, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). Because Plaintiff has not named the United States as a defendant, the court finds that the FTCA does not provide a basis for subject matter jurisdiction over Plaintiff's tort claims against the USDOE.

**\*4** As Plaintiff has failed to establish any basis upon which this court has subject matter jurisdiction, the USDEO is entitled to dismissal under Rule 12(b)(1).

*Merits*

Although the court's decision on the jurisdictional question is dispositive, the court notes that even assuming this court had subject matter jurisdiction over Plaintiff's claims against the USDOE, summary judgment in favor of the USDOE would be appropriate. First, Plaintiff claims that attempts to collect his student loan debt are barred by Michigan's statute of limitations, MCL 600.5809(8) , and equitable laches. The 1991 amendments to the Higher Education Act, 20 U.S.C. § 1091a, eliminated all statute of limitations and laches defenses for the collection of student loans. Section 1091 a states that the purpose of the subsection is to provide that the repayment of loans are enforced regardless of any federal or state statutory, regulatory, or administrative limitation which might otherwise "terminate the period of time within which suit may be filed, a judgment may be enforced, or an offset, garnishment, or other action initiated." 20 U.S.C. § 1091 a(1) and (2); *see Millard v. United*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4245409 (W.D.Mich.)
**(Cite as: 2007 WL 4245409 (W.D.Mich.))**

*Student Aid Funds, Inc.,* 66 F.3d 252, 253 (9th Cir.1995); *United States v. Lawrence,* 276 F.3d 193, 196 (5th Cir.2001) (" § 1091 also extends to eliminate the equitable defense of laches"). In addition, section 1091 a has retroactive effect. *United States v. Phillips,* 20 F.3d 1005, 1007 (9th Cir.1994) (holding that Congress made the 1991 amendments effective such as to revive all actions which would have otherwise been time-barred); *United States v. Hodges,* 999 F.2d 341, 341-42 (8th Cir.1993); *United States v. Glockson,* 998 F.2d 896 (11th Cir.1993). Therefore, neither the State's statute of limitations nor equitable laches precludes the USDOE from attempting to collect Plaintiff's student loan debt.

Next, Plaintiff claims that the forms Defendants used are prohibited by the FDCPA and state law. The FDCPA protects debtors from the improper practices of "debt collectors." The USDOE, however, is not a "debt collector" as defined by the statute. The term "debt collector" is limited to third parties who attempt to recoup debts owed to "another," but a creditor who collects its own debt using its own name is not a "debt collector." 15 U.S.C. § 1692a(6); *MacDermid v. Discover Financial Services,* 488 F.3d 721, 734 (6th Cir.2007); *Catencamp v. Cendant Timeshare Resort Group-Consumer Fin., Inc.,* 471 F.3d 780, 781 (7th Cir.2006). Also excluded from the definition of "debt collector" is "any officer or employee of the United States or any State to the extent that collecting or attempting to collect any debt is in the performance of his official duties." 15 U.S.C. § 1692a(6)(C). Accordingly, this claim against the USDOE has no merit.

Plaintiff's third claim is specifically brought solely against Van Ru. [FN4] His final claim is for the tort of conversion. The FTCA provides that an "action shall not be instituted upon a claim against the United States for money damages ... unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and

sent by certified or registered mail." 28 U.S.C. § 2675(a). Thus, filing an administrative claim is a jurisdictional prerequisite to maintaining an action against the government. *Lundstrum v. Lyng,* 954 F.2d 1142, 1145 (6th Cir.1991) ("A prerequisite to suit under the FTCA ... is the exhaustion by the plaintiff of administrative remedies"); *Rogers v. United States,* 657 F.2d 123, 124 (6th Cir.1982). The burden is on the plaintiff seeking recovery under the FTCA to plead and prove compliance with this prerequisite. *Johnson v. The Smithsonian Institution,* 189 F.3d 180, 188 (2d Cir.1999). Because Plaintiff does not allege that he, at any time, filed an administrative claim with the USDOE, nor has he provided any other evidence to show that he has properly filed an administrative claim, the court finds that Plaintiff is precluded from bringing his conversion claim against the USDOE.

> FN4. Plaintiff's third claim is that Van Ru claims to have authority to garnish Plaintiff's wages in violation of MRCP, § 445.252 and the FDCPA, §§ 1692(f) and (j)

## II. VAN RU CREDIT CORPORATION

**\*5** Van Ru brings its motion for summary judgment under Federal Rule of Civil Procedure 56. Rule 56(c) provides that "[s]ummary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In considering a motion for summary judgment, the court must construe the evidence and draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1996). The plain language of Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4245409 (W.D.Mich.)
**(Cite as: 2007 WL 4245409 (W.D.Mich.))**

bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party opposing the motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial ." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "If after reviewing the record as a whole a rational factfinder could not find for the nonmoving party, summary judgment is appropriate." *Braithwaite v. The Tinken Co.,* 258 F.3d 488, 493 (6th Cir.2001).

Plaintiff claims that attempts to collect his student loan debt are barred by Michigan's statute of limitations, MCL 600.5809(8), and equitable laches. (Amend.Compl.18, 19). For the reasons discussed in regard to the USDOE on this issue, the claim has no merit. Title 20 U.S.C. § 1091 a(1) states that the purpose of the subsection is to provide that the repayment of loans are enforced regardless of any federal or state statutory, regulatory, or administrative limitation which might otherwise "terminate the period of time within which suit may be filed, a judgment may be enforced, or an offset, garnishment, or other action initiated." It is well settled that since this provision was enacted, there is no statute of limitations for student loan collection actions, *United States v. Cawley,* 821 F.Supp. 1219, 1222 (E.D.Mich.1993); *see also United States v. Lawrence,* 276 F.3d 193, 196 (5th Cir.2001); *United States v. Phillips,* 20 F.3d 1005, 1007 (9th Cir.1994) (in eliminating the statute of limitations, Congress "also revived all actions which would have otherwise been time-barred"); *United States v. Hodges,* 999 F.2d 341, 341-42 (8th cir.1993), nor does the doctrine of laches apply. *Texaco Puerto Rico, Inc. V. Dep't of Consumer Affairs,* 60 F.3d 867, 878 (1st Cir.1995); *United States v.Robbins,* 819 F.Supp. 672, 676 (E.D.Mich.1993) ( "laches cannot be applied to contract actions brought to recover student loans that are subject to 20 U.S.C. § 1091a(a)").

Plaintiff also claims that the forms Van Ru used to garnish his wages are prohibited by the FDCPA and state law. (Amend.Comp.# 20). More specifically, he states that the "use of forms or instruments which simulate the appearance of judicial process; using seals or printed forms of a government agency or instrumentality; using forms that may otherwise induce the belief that they have judicial or official sanction; all are prohibited acts under ... MCL 445.252 and 15 U.S.C. 1692 ...." (Amend.Compl.# 20). He argues that Van Ru used stationary which appears to be from the State of California and the CSAC, and which displayed the seal of the State of California. (Amend.Comp.# 11). In determining whether any particular conduct violates the FDCPA, the Sixth Circuit uses an objective test based on the understanding of the least sophisticated consumer. *Federal Home Loan Mortgage Corp. v. Lamar,* 503 F.3d 504, 509-10 (6th Cir.2007); *Lewis v. ACB Business Services, Inc.,* 135 F.3d 389, 400 (6th Cir.1998).

**\*6** The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors." 15 U.S.C. § 1692(e); *MacDermid v. Discover Financial Services,* 488 F.3d 721, 734 (6th Cir.2007). In furtherance of this goal, the Act prohibits the use of "false, deceptive, or misleading representation ...," including the "false representation or implication that the debt collector is vouched for, bonded by, or affiliated with the United States or any State ...." 15 U.S.C. § 1692c(1). The Order of Withholding From Earnings (Amend.Compl.Ex. 3), is printed on stationary displaying the California state seal, the words "STATE OF CALIFORNIA," and "CALIFORNIA STUDENT AID COMMISSION-Post Default Services-Administrative Wage Garnishment." The employer is merely directed to make the payments to Van Ru, but the document clearly states that the order is issued pursuant to authority granted by Federal law to the CSAC. Because the CSAC is an agency of the State of California, there is nothing misleading or deceptive on the stationary which was used. Moreover, the order identifies it as an "Administrative Wage Garnish-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4245409 (W.D.Mich.)
**(Cite as: 2007 WL 4245409 (W.D.Mich.))**

ment," and nothing indicates or implies that it is a court order. Even an unsophisticated consumer would not be deceived by the document.

Next, Plaintiff contends that only the Secretary of Education is authorized to institute garnishment proceedings. Accordingly, the garnishment of Plaintiff's wages by Van Ru was a violation of 15 U.S .C. § 1692(f) and (j). The CSAC, as a guaranty agency responsible for administering financial aid programs for students, is authorized by federal statute to administratively garnish wages. The applicable federal statute provides in part that: "[n]otwithstanding any provision of State law, a guaranty agency ... may garnish the disposable pay of an individual to collect the amount owed by the individual, if he or she is not currently making required repayment under a repayment agreement ...." 20 U.S.C. § 1095a(a). The "Order of Withholding From Wages," placed on CSAC letterhead, clearly states that the garnishment order was issued pursuant to authority granted to CSAC under 20 U.S.C. § 1095a. The order merely directs the employer to pay the withheld amounts to Van Ru. (Amend.Compl.Ex. 3). Plaintiff had previously been advised by letter on CSAC letterhead that CSAC "will order your employer to immediately withhold money from your pay ... for payment of your defaulted student loans, unless you take the action set forth in this notice," and Plaintiff was directed to establish a written repayment agreement with Van Ru. (Amend.Compl.Ex. 2). Accordingly, it is clear that the garnishment order emanated from CSAC pursuant to its statutory authority. Nothing in the garnishment order suggests that Van Ru was initiating the garnishment.

Lastly, Plaintiff claims that the garnishment of his wages constitutes unlawful conversion, which is a state law claim. (Amend.Comp. §§ 23-25). "Under Michigan law, conversion is defined generally as 'any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein.'" *Murray Hill Publications, Inc. v. ABC Communications, Inc.,* 264

F.3d 622, 637 (6th Cir.2001), *quoting Sarver v. Detroit Edison Co.,* 571 N.W.2d 759, 761, 225 Mich.App. 580 (Mich.Ct.App.1997). As previously noted, 20 U.S.C. § 1095a(a) authorizes a guaranty agency, such as CSAC, to garnish the wages of a student loan debtor who is in default. Thus, when CSAC garnished Plaintiff's wages, it was not "wrongfully" exerting control over Plaintiff's property, and therefore, did not commit conversion as defined by Michigan law.

*Conclusion*

**\*7** The court lacks subject matter jurisdiction over Plaintiff's claims against the USDOE. The USDOE's motion for dismissal under Federal Rule of Civil Procedure 12(b)(1) (docket # 48) is therefore GRANTED.

Further, there are no genuine issues of material fact, and Van Ru is entitled to judgment as a matter of law. Van Ru's Motion for Summary Judgment (docket # 50) is therefore GRANTED.

So ordered.

W.D.Mich.,2007.
Greenland v. Van Ru Credit Corp.
Not Reported in F.Supp.2d, 2007 WL 4245409 (W.D.Mich.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 1

Not Reported in F.Supp.2d, 2008 WL 5381866 (E.D.Mich.), 67 UCC Rep.Serv.2d 692
**(Cite as: 2008 WL 5381866 (E.D.Mich.))**

c

United States District Court,
E.D. Michigan,
Southern Division.
Harrison W. MUNSON and Gerald L. Munson,
Plaintiffs,
v.
COUNTRYWIDE HOME LOANS, INC., Country-
wide Bank, Lucy Chacon, Mark Wilson, Lee
Gonzalez, Great Lakes Mortgage Company L.L.C.,
John Doe, Midwest Appraisal Group, and John
Schwartz, Jr., Defendants.
No. 08-13244.

Dec. 17, 2008.

West KeySummary
**Banks and Banking 52 ☜⟶100**

52 Banks and Banking
   52III Functions and Dealings
      52III(A) Banking Franchises and Powers,
and Their Exercise in General
         52k100 k. Torts. Most Cited Cases

**Mortgages 266 ☜⟶216**

266 Mortgages
   266IV Rights and Liabilities of Parties
      266k215 Actions for Damages
         266k216 k. Between Parties to Mortgage
or Their Privies. Most Cited Cases
Under Michigan law, homeowners could not estab-
lish a prima facie case for fraudulent representation
against a bank. The bank did not perform the ap-
praisal of the home or make any statements regard-
ing its value. There were also insufficient allega-
tions that the bank was aware of an inflated ap-
praisal value. Furthermore, there could have been
no misrepresentation of a material fact as the re-
cords used for the appraisal were public.

Harrison W. Munson, Detroit, MI, for Plaintiffs.

Brian C. Summerfield, Bodman, Troy, MI, Timothy
L. Taylor, Bos & Glazier, Grand Rapids, MI, for
Defendants.

### ORDER GRANTING MOTION TO DISMISS AS TO DEFENDANTS COUNTRYWIDE HOME LOANS, INC., COUNTRYWIDE BANK, LUCY CHACON, MARK WILSON AND LEE GONZALEZ, ONLY

VICTORIA A. ROBERTS, District Judge.

### I. INTRODUCTION

*1 This matter is before the Court on Defendants'
Motion to Dismiss [Docket # 3], filed August 15,
2008. Plaintiff filed a Response [Docket # 4] on
September 2, 2008. Defendants filed a Reply
[Docket # 5] on September 10, 2008.

For the reasons stated below, Defendants' Motion is
**GRANTED.**

### II. BACKGROUND

This is a consumer lending case arising out of a
mortgage and foreclosure on Plaintiffs' home.
Plaintiffs, a Michigan licensed attorney and his
spouse, originally filed this action in the Oakland
County Circuit Court on June 30, 2008, alleging
five counts against: Countrywide Home Loans, Inc.
("Countrywide Loans"), the loan servicer; Country-
wide Bank ("Countrywide Bank"), the lender; Lucy
Chacon, Mark Wilson, and Lee Gonzalez ("the
Countrywide employees"), employees of Country-
wide Loans and Countrywide Bank; Great Lakes
Mortgage Company, LLC ("Great Lakes"), the
mortgage broker; John Doe, an employee of Great
Lakes; Midwest Appraisal Group, Inc.
("Midwest"); and John Schwartz, Jr., a home ap-
praiser. Defendants Countrywide Loans, Country-
wide Bank, and the Countrywide employees timely

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5381866 (E.D.Mich.), 67 UCC Rep.Serv.2d 692
**(Cite as: 2008 WL 5381866 (E.D.Mich.))**

removed on July 29, 2008.

Plaintiffs allege: Count I-Breach of Contract; Count II-Fraud and Misrepresentation; Count III-Violation of the Fair Debt Collection Practices Act, 15 U.S.C. 1692 et seq.; Count IV-Unjust Enrichment; and Count V-Violation of the Michigan Uniform Commercial Code, MCL 440.1101 et seq. Plaintiffs allege all five counts against Defendants Countrywide Bank and Countrywide Loans. Plaintiffs allege only Count III against the Countrywide employees.

This matter arises out of Plaintiffs' purchase of residential property located at 5205 Creekmonte Drive, Unit 54, Rochester, Michigan. Great Lakes provided mortgage broker services and employed John Schwartz of Midwest to prepare the appraisal for the property. The property was appraised for $615,000.00 on February 4, 2005. Plaintiffs (incorrectly) say they gave Countrywide Loans a $565,000.00 mortgage on March 24, 2005; the actual Mortgage says the lender is Countrywide Bank. Plaintiffs say that Countrywide Loans erroneously submitted their account to the credit bureau as 60 days late, which caused other lenders to refuse to refinance the loan. Plaintiffs say they sought a loan modification, which Countrywide Loans and Countrywide Bank denied. Plaintiffs say that Countrywide Loans and Countrywide Bank are alter egos and that their refusal to grant the loan modification was wrongful. Plaintiffs also say that Countrywide Loans and Countrywide Bank used an inflated appraisal which did not include properties comparable in size, type and price; Plaintiffs say this constituted a material misrepresentation on which they relied to their detriment.

Defendants Countrywide Loans, Countrywide Bank, and the Countrywide employees move to dismiss. They say Plaintiffs' claims are baseless and should be dismissed because: (1) Plaintiffs failed to allege any breach of the note or mortgage by Countrywide Bank; (2) Plaintiffs don't have a contract with Countrywide Loans; (3) Plaintiffs failed to allege fraud with particularity; (4) the Countrywide employees are not debt collectors and there are no allegations supporting a violation of the Fair Debt Collection Practices Act; (5) the unjust enrichment claim is precluded because there is an express contract between Plaintiffs and Countrywide Bank; and (6) foreclosure sales are governed by MCL 600.3216, not by the Uniform Commercial Code.

**III. STANDARD OF REVIEW**

*2 Dismissal is appropriate under Federal Rule of Civil Procedure 12(b)(6), where a plaintiff fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). Rule 12(b)(6) requires the Court to construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff's allegations plausibly establish a case which would entitle the plaintiff to relief. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1968-70, 167 L.Ed.2d 929 (2007). Factual allegations contained in a complaint must "raise a right to relief above the speculative level." *Id.* at 1965. *Twombly* does not "require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974.

When a court is presented with a Rule 12(b)(6) motion, it may consider the complaint and any attached exhibits, public records, items appearing in the record and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the contained claims. See *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir.2001). "[T]o avoid dismissal under Rule 12(b)(6), a complaint must contain either direct or inferential allegations with respect to all the material elements of the claim." *Wittstock v. Mark a Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir.2003). "A judge may not grant a Fed.R.Civ.P. 12(b)(6) motion to dismiss based on a disbelief of a complaint's factual allegations. *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir.1993).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5381866 (E.D.Mich.), 67 UCC Rep.Serv.2d 692
**(Cite as: 2008 WL 5381866 (E.D.Mich.))**

## IV. CASE LAW AND ANALYSIS

### A. TWOMBLY ARGUMENT

Defendants argue that Plaintiffs' entire complaint should be dismissed because the allegations are insufficient to state a claim upon which relief can be granted. The Court does not agree.

The nature of each of Plaintiffs claims is sufficiently articulated such that Defendants and the Court need not "guess" what Plaintiff is alleging.

Although the Court finds that most claims are insufficiently pled, the Complaint is not defective in its entirety. Generally, the Complaint contains "sufficient factual information to provide the 'grounds' on which the claims rest. *Schaaf v. Residential Funding Corp.,* 517 F.3d 544, 549 (8th Cir.2008). Accordingly, the Court denies Defendants' Motion to Dismiss based on *Twombly.*

### B. PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF CONTRACT

In Count I, Plaintiffs allege that Countrywide Loans initially breached its contract with Plaintiffs by using an inflated appraisal which did not include properties comparable in size, type and price. Plaintiffs also say Countrywide Loans unilaterally changed the terms of the mortgage contract to no longer provide four payment options previously granted: (1) 30-year amortization, (2) 15-year-amortization, (3) minimum payment, and (4) interest only. They say Countrywide Loans claimed that it was unable to calculate the four options, so it began requesting the "minimum payment." Lastly, Plaintiffs say Countrywide Loans erroneously submitted their account to the credit bureaus as 60 days late, dating back to 2004. For example, Plaintiffs say their February 2006 payment was reported as 60 days late in February 2006, despite the fact that the March 2006 payment had already been made. Plaintiffs say these errors caused other financial institutions to refuse to refinance the loan. Plaintiffs allege these combined actions constitute a breach of the mortgage contract. Plaintiffs also allege that Countrywide Loans and Countrywide Bank are alter egos and should be treated as one.

*3 The Court notes that throughout the Complaint, Plaintiffs incorrectly allege they have a contract with Countrywide Loans. However, in conjunction with this loan transaction, on March 24, 2005 Plaintiffs singularly or jointly executed several documents: (1) Adjustable Rate Note ("ARN"), (2) Mortgage, and (3) Adjustable Rate Rider ("ARR"). The Mortgage document lists the borrowers as Harrison Munson and Geri Munson, and the lender as Countrywide Bank. Countrywide Loans is not listed in any of these documents and Defendants say Countrywide Loans is merely the loan servicer for Countrywide Bank.

Plaintiffs allege Countrywide Bank and Countrywide Loans are alter egos; they address both companies as one and impute Countrywide Bank's actions to Countrywide Loan throughout their Complaint and Response. However, it is clear this is an assumption and conclusion and it is not supported by any proofs.

In Michigan, to pierce the corporate veil or find that one company is the 'alter ego' of another, the corporate entity must be a mere instrumentality of another entity or individual; the corporate entity must be used to commit a fraud or wrong; and there must be an unjust loss or injury to Plaintiffs. See *Daymon v. Fuhrman,* 474 Mich. 920, 705 N.W.2d 347 (2005). Plaintiffs fail to adequately allege any of these factors or reference any case law to support piercing the corporate veil; their analysis of the issue is merely conclusory. Plaintiffs only assert that Countrywide Bank is an alter ego of Countrywide Loans "because one speaks for the other ." (Docket # 4, p. 5). This theory of alter-ego is unsubstantiated and the Court evaluates the entities separately.

### i. COUNTRYWIDE LOANS

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5381866 (E.D.Mich.), 67 UCC Rep.Serv.2d 692
**(Cite as: 2008 WL 5381866 (E.D.Mich.))**

Plaintiffs have no contract with Countrywide Loans; the breach of contract claim against it fails in its entirety.

### ii. COUNTRYWIDE BANK

In the Mortgage, the listed loan amount is $565,000.00. It contains various borrower, uniform and non-uniform covenants. Likewise, the ARN contains the borrowers' promise to pay $565,000.00 plus interest to Countrywide Bank in exchange for a loan received. The Mortgage says it is to be governed by federal law and the law of the jurisdiction in which the property is located. Michigan law governs.

To state a claim for breach of contract, Plaintiffs must first establish the elements of a valid contract. See *Pawlak v. Redox Corp.,* 182 Mich.App. 758, 453 N.W.2d 304, 307 (Mich.Ct.App.1990). The elements of a valid contract are: 1) parties competent to contract, 2) a proper subject matter, 3) a legal consideration, 4) mutuality of agreement, and 5) mutuality of obligation. *Thomas v. Leja,* 187 Mich.App. 418, 468 N.W.2d 58, 60 (Mich.Ct.App.1990). Plaintiffs allege facts sufficient to meet all of these elements, and the Court finds the Mortgage and the ARN constitute a valid contract between Plaintiffs and Countrywide Bank.

Once a valid contract is established, a plaintiff seeking to recover on a breach of contract theory must prove by a preponderance of the evidence: (1) the terms of the contract; (2) defendant breached the terms; and (3) the breach caused the plaintiff's injury. See *Platsis v. E.F. Hutton & Co., Inc.,* 642 F.Supp. 1277, 1309 (W.D.Mich.1986).

**\*4** The ARN lists an initial interest rate of 3.000%. It contains an adjustable interest rate provision which provides that the interest rate *may* change on May 1, 2005 (37 days after the loan inception) and on the 1st day of every subsequent month; this is called the "Interest Rate Change Date." Although the interest rate could change monthly, the monthly payment was not recalculated on a monthly basis. *See* ARN ¶ 2(B) and 3. This could result in negative amortization.

The ARR, which is incorporated in the Mortgage, contains a complicated schedule for calculation of interest rate, interest rate changes, monthly payments, monthly payment changes and payment options. It provides that the initial monthly payment would be $2,382.06, until May 1, 2006. It further says that on May 1, 2006 and each successive May 1st thereafter, the monthly payment *may* change; this is referred to as the "Payment Change Date." Each month beginning on each payment change date, Plaintiffs were required to pay the amount of the new "Minimum Payment"; this is the minimum amount that Countrywide Bank would accept as a monthly payment, as determined at the last payment change date or as provided in sections 3(F) or 3(G). Unless sections 3(F) or 3(G) applied, the new monthly payment effective on a payment change date would not increase by more than 7.5% of the prior monthly payment; this is called the "Payment Cap."

The ARR also says that after the first interest rate change, Countrywide Bank *may* provide Plaintiffs with up to three additional payment options that are *greater* than the minimum payment: (1) interest only, (2) fully amortized, and (3) 15 year amortized. The ARR recognizes that because the monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to certain payment limitations, the minimum payment could be less than the interest portion of the monthly payment that would be sufficient to repay the unpaid principal in full at the maturity date in equal installments. In such case, Countrywide Bank was to subtract the amount of the monthly payment from the interest portion and add the difference to the unpaid principal; interest was to accrue on this difference.

Contrary to Plaintiffs' assertions, it was not a breach of the mortgage contract for Countrywide Bank, and Countrywide Loans as its servicer, to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5381866 (E.D.Mich.), 67 UCC Rep.Serv.2d 692
**(Cite as: 2008 WL 5381866 (E.D.Mich.))**

cease providing four payment options because the Mortgage did not require them to do so. The Mortgage clearly says the lender *may* provide up to three additional payment options. Moreover, the Mortgage contemplates that all of the additional payment options would be greater than the "Minimum Payment"; the "Minimum Payment" is the minimum amount the note holder would accept for a monthly payment. So, it could not be a breach for Countrywide Bank to demand that Plaintiffs pay the "Minimum Payment," the lowest of the possible payment options. To the extent that Plaintiffs allege the "minimum payment" request was a breach of the Mortgage contract, that claims fails.

**\*5** Likewise, to the extent that Plaintiffs allege the failure to modify the loan terms was a breach of contract, that claim fails. It is logical that the loan servicer would consult with the lender, Countrywide Bank, for approval to modify the loan. Moreover, nothing in the Mortgage contract requires Countrywide Bank to modify the loan terms upon request by Plaintiffs, and Plaintiffs fail to identify legal authority that requires such a result.

Plaintiffs also allege Countrywide Bank erroneously submitted their account to the credit bureau as 60 days late dating back to 2004, despite the fact that payment had been made. Plaintiffs say this caused other lenders to refuse to refinance the loan. However, the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et seq., preempts any subject matter regulated under section 1681s-2. *See* 15 U.S.C. § 1681t(b)(1)(F). While there is considerable dispute about the extent of the FRCA's preemption of state law claims, see *Stafford v. Cross Country Bank,* 262 F.Supp.2d 776, 784-89 (W.D.Ky.2003) (providing an extensive discussion of the different preemption provisions, their varying interpretations, and their application to different types of state law claims), it is clear that when a state law imposes distinct duties with respect to the subject matter regulated by § 1681s-2, it is preempted, *Riley v. Gen. Motors Acceptance Corp.,* 226 F.Supp.2d 1316, 1322 (S.D.Ala.2002).

The Court need not engage in an extensive discussion of how 1681t(b)(1)(F) preempts different types of state law claims, however, because this breach of contract allegation is founded solely on Countrywide Bank's actions in reporting Plaintiffs' payment history. Since the reporting of credit information is the subject matter regulated by § 1681s-2, this breach of contract claim is preempted.

In Response to this Motion, Plaintiffs assert for the first time an additional claim: Countrywide Bank breached the contract by instituting a payment change in March 2008, rather than May as required in the ARN. Plaintiffs say the two contingencies which would allow a different payment change date-(1) the principal balance exceeding 115% of the original balance or (2) the fifth payment change date-had not yet occurred, so the arbitrary change was a breach. Plaintiffs do not allege this in the Complaint. Our Circuit makes clear: a plaintiff may not omit a claim from his complaint and then attempt to raise it for the first time in a motion brief. See *Davison v. Cole Sewell Corp.,* 231 F. App'x 444, 450-51 (6th Cir.2007). The Court declines to address this allegation.

Because Plaintiffs fail to state a claim for breach of contract, Defendants' Motion to Dismiss Count I against Countrywide Loans and Countrywide Bank is granted.

## C. PLAINTIFFS FAIL TO STATE A CLAIM FOR FRAUD AND MISREPRESENTATION

Defendants say that Plaintiffs failed to plead the elements of fraud with particularity, and there are no allegations that Countrywide Bank made any representations to Plaintiffs. As such, Defendants say Plaintiffs' claim must be dismissed.

**\*6** Federal Rule of Civil Procedure 9(b) states that:

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5381866 (E.D.Mich.), 67 UCC Rep.Serv.2d 692
**(Cite as: 2008 WL 5381866 (E.D.Mich.))**

may be averred generally.

Fed.R.Civ.P. 9(b). The Sixth Circuit holds that Rule 9(b) must be read liberally. See *Coffey v. Foamex L.P.,* 2 F.3d 157, 161 (6th Cir.1993). It is also true that at a minimum, the plaintiff must "allege the time, place, and content of the alleged misrepresentations on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Id.* at 162. "[A]llegations of fraudulent misrepresentation must be made with sufficient particularity and with a sufficient factual basis to support an inference that they were knowingly made." *Id.* at 162. Moreover, where there are multiple defendants, a claim must identify who made the alleged misrepresentations. *Hoover v. Langston Equipment Assoc., Inc.,* 958 F.2d 742, 745 (6th Cir.1992). A pleading that fails to comply with the requirements of Rule 9(b) fails to state a claim under Rule 12(b)(6). *Michigan ex rel. Kelley v. McDonald Dairy Co.,* 905 F.Supp. 447, 450 (W.D.Mich.1995).

If the Court finds that Plaintiff failed to state fraud with sufficient particularity, "in the absence of defendant's motion for more definitive statement under Rule 12(e), dismissal on this basis alone would not be appropriate." *Coffey* at 162 (6th Cir.1993). However, the Court will not review Defendants' argument regarding Plaintiffs' failure to sufficiently plead fraud with particularity, because the face of Plaintiffs' Complaint reveals that Plaintiffs cannot establish a prima facie case for fraudulent misrepresentation.

Michigan adheres to the general rule that six elements of actionable fraud or misrepresentation must be found and proved by clear and convincing evidence:

1) the defendant made a material misrepresentation; 2) that it was false; 3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; 4) that he made it with the intention that it should be acted upon by plaintiff; 5)

that plaintiff acted in reliance upon it; and 6) that he thereby suffered injury. Each of these facts must be proved with a reasonable degree of certainty.

*Hi-Way Motor Co. v. Int'l Harvester Co.,* 398 Mich. 330, 335-36, 247 N.W.2d 813 (1976). A material misrepresentation must be a statement relating to a past or existing fact. *Id.* at 336, 247 N.W.2d 813. Statements of opinion and "puffing" are not representations of material fact that would give rise to a claim of fraud. *Graham v. Myers,* 333 Mich. 111, 115, 52 N.W.2d 621 (1952).

Plaintiffs' theory of recovery against Defendants Country Loans and Countrywide Bank rests upon the alleged misrepresented appraisal values used to induce Plaintiffs into mortgage agreements related to the residential property, and the failure to modify Plaintiffs' loan terms unless they paid additional funds. Plaintiffs allege that the tactics used by Countrywide Loans, Countrywide Bank, and its appraisers constitute fraud. Plaintiffs allege that Schwartz's appraisal used as comparables, single family homes in more affluent subdivisions, which had more square footage and higher values than their condominium. Plaintiffs say that during the time period Schwartz prepared the appraisal on their home, there were comparable condos in their subdivision that had recently sold, and his failure to compare those like properties was a material misrepresentation.

**\*7** However, possession of actual or constructive knowledge of a misrepresentation is not the equivalent of making a material misrepresentation. Plaintiffs do not allege that Countrywide Loans and Countrywide Bank participated in the preparation of the inflated appraisal. Countrywide Loans and Countrywide Bank did not make a material misrepresentation; they did not perform the appraisal on the home, nor did they make statements regarding the value of the home. Further, there are insufficient allegations in the Complaint to establish that Countrywide Loans and Countrywide Bank were aware of an inflated appraisal value.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5381866 (E.D.Mich.), 67 UCC Rep.Serv.2d 692
**(Cite as: 2008 WL 5381866 (E.D.Mich.))**

In any event, the records relied upon to make the appraisal were public. Thus, even if Countrywide Loans and Countrywide Bank were aware of these facts, they could hardly have suppressed this information since it was available to Plaintiffs. There can be no misrepresentation of a material fact where the Plaintiff has equal access to the information alleged to have been misrepresented and suppressed. See *Wysaski v. Universal Homes, LLC,* 2007 U.S. Dist. LEXIS 21595, 2007 WL 951435 (E.D.Mich.2007).

Similarly, there can be no misrepresentation based on a failure to modify the loan terms. Plaintiffs failed to provide the Court with legal authority stating that Countrywide Loans and Countrywide Bank had a legal duty to modify the loan because Plaintiffs were unhappy with its terms.

For these reasons, Plaintiffs cannot establish a prima facie case of fraud or misrepresentation. The Court grants Defendants' Motion to Dismiss Count II against Defendant Countrywide Loans and Countrywide Bank.

## D. PLAINTIFFS FAIL TO STATE A CLAIM FOR VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT

Defendants say this claim is baseless because none of the Defendants is a debt collector, as defined by the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. 1692 et seq.

The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors." 15 U.S.C. § 1692(e). The term "debt collector" has a particular meaning, however: it refers only to persons attempting to collect debts due "another." See *id.* § 1692a(6) ("The term 'debt collector' means any person who ... regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."). The Sixth Circuit construed the FDCPA in *Montgomery v. Huntington Bank,* 346 F.3d 693 (6th Cir.2003) and,

in that case, determined that "the legislative history of section 1692a(6) indicates conclusively that a debt collector does not include the consumer's creditors...." *Id.* at 698 (citing *Perry v. Stewart Title Co.,* 756 F.2d 1197, 1208 (5th Cir.1985) (emphasis added)). See also, *Wadlington v. Credit Acceptance Corp. .,* 76 F.3d 103, 106 (6th Cir.1996) (quoting S.Rep. No. 95-382, 95th Cong., 1st Sess. 3, reprinted in 1977 U.S.Code Cong. & Ad. News 1695, 1698); *Aubert v. American Gen. Fin., Inc.,* 137 F.3d 976, 978 (7th Cir.1998) ("Creditors who collect in their own name and whose principal business is not debt collection ... are not subject to the Act.")

**\*8** Notwithstanding the exclusion provided by § 1692a(6)(F), the term "debt collector" includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts. For the purpose of the Act, such term also includes any person who uses any instrumentality of interstate commerce or the mails in any business, the principal purpose of which is the enforcement of security interests. The term does not include:

(A) any officer or employee of a creditor while, in the name of the creditor, collecting debts for such creditor;

(B) any person while acting as a debt collector for another person, both of whom are related by common ownership or affiliated by corporate control, if the person acting as a debt collector does so only for persons to whom it is so related or affiliated and if the principal business of such person is not the collection of debts;

\* \* \*

(F) any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity

(i) is incidental to a bona fide fiduciary obligation or a bona fide escrow arrangement;

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5381866 (E.D.Mich.), 67 UCC Rep.Serv.2d 692
**(Cite as: 2008 WL 5381866 (E.D.Mich.))**

(ii) concerns a debt which was originated by such person;

(iii) concerns a debt which was not in default at the time it was obtained by such person; or

(iv) concerns a debt obtained by such person as a secured party in a commercial credit transaction involving the creditor.

15 U.S.C. § 1692a(6).

Plaintiffs allege Countrywide Bank tried to deceive them into believing it does not control Countrywide Loans, when they actually are the same. Plaintiffs also allege the Countrywide employees initiated telephone calls to Plaintiffs and tried to deceive them into believing that Countrywide Loans needed permission from Countrywide Bank to modify the loan. They say Countrywide Loans used subversive means by using the name of its alter ego, and the Countrywide employees asked for $75,000 before a loan modification would be considered.

These allegations, even assuming they are true, are insufficient to state a claim for relief under the FD-CPA. First, Plaintiffs allege deceptive acts which center around their requests to obtain a loan modification. Plaintiffs do not allege Defendants made the telephone solicitations and assertions in order to collect a debt. In order for the FDCPA to apply, the practice in question must constitute an attempt to collect a "debt."

Second, Plaintiffs cite the FDCPA, but do not allege which provision of the FDCPA the Defendants violated.

Lastly, none of these Defendants meets the FD-CPA's definition of a debt collector. Countrywide Bank originated the loan and is Plaintiffs' creditor, and hence is not a debt collector. Countrywide Loans also is not a debt collector. Plaintiffs do not allege the loan was in default at the time Countrywide Loans began servicing the loan. In fact, they say Countrywide Loans was erroneously submitting their account as late to the credit reporting bureaus.

A person is not a "debt collector" subject to the Act if the debt he seeks to collect was not in default at the time he purchased or otherwise obtained it. *Bailey v. Sec. Nat'l Servicing Corp.,* 154 F.3d 384 (7th Cir.1998). Finally, the Act specifically excludes employees of a creditor who attempt to collect a debt for that creditor. So, the Countrywide employees also are not debt collectors.

**\*9** The Court dismisses Count III against Country Bank, Countrywide Loans, and the Countrywide employees.

## E. PLAINTIFFS FAIL TO STATE A CLAIM FOR UNJUST ENRICHMENT

Defendants say that Plaintiffs cannot maintain a claim for unjust enrichment against Countrywide Bank because there is an express contract between those parties. Defendants also say that Plaintiffs have not alleged that Countrywide Loans received any benefit from Plaintiffs.

The elements of an implied contract in law to prevent unjust enrichment are: (1) receipt of a benefit by the defendant from the plaintiff and, (2) inequitable retention by defendant of that benefit. *Roznowski v. Bozyk,* 73 Mich.App. 405, 251 N.W.2d 606, 608 (Mich.Ct.App.1977). However, as Defendants correctly note, an implied contract cannot be enforced where the parties made an express contract covering the same subject matter." *Scholz v. Montgomery Ward & Co.,* 437 Mich. 83, 468 N.W.2d 845, 849 (Mich.1991). There cannot be an express and implied contract covering the same subject matter at the same time. *Superior Ambulance Service v. Lincoln Park,* 19 Mich.App. 655, 173 N.W.2d 236 (1969).

The Court previously found that there is an express contract between Plaintiffs and Countrywide Bank-the Note and the Mortgage. Accordingly, Plaintiffs cannot maintain a claim for unjust enrichment against Countrywide Bank.

As for Countrywide Loans, the defendant must

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5381866 (E.D.Mich.), 67 UCC Rep.Serv.2d 692
**(Cite as: 2008 WL 5381866 (E.D.Mich.))**

have received a benefit directly from the plaintiff. See *A & M Supply Co. v. Microsoft Corp.*, No. 274164, 2008 Mich.App. LEXIS 433, 2008 WL 540883 (Mich.Ct.App. Feb. 28, 2008). At minimum, this involves some sort of direct contact between the parties. *Id.* Accordingly, Michigan law requires that Plaintiffs allege they provided mortgage proceeds directly to Countrywide Loans. Plaintiffs do not and cannot make such an allegation.

The Court grants Defendants' Motion to Dismiss Count IV against Countrywide Bank and Countrywide Loans.

## F. PLAINTIFFS FAIL TO STATE A CLAIM FOR VIOLATION OF THE UNIFORM COMMERCIAL CODE, MCL 440.1101 ET SEQ.

Defendants say that foreclosures by advertisement and the sale of this property are governed by MCL 600.3201 et seq., not by the Michigan Uniform Commercial Code ("UCC"), MCL 440.1101 et seq. Defendants say this claim is nonsensical and should be dismissed.

Plaintiffs say the UCC governs their mortgage transaction because the Note which Defendants pledged to guarantee their investors' investment is personal property. They say the UCC requires sales of personal property to be made in a commercially reasonable manner.

Although a mortgage is a contingent interest in real property, a note secured by a mortgage is itself personal property. *Union Guardian Trust Co. v. Nichols*, 311 Mich. 107, 115, 18 N.W.2d 383 (1945). The owner of a note secured by a mortgage may transfer the note to third parties. *Ginsberg v. Capitol City Wrecking Co.*, 300 Mich. 712, 717, 2 N.W.2d 892 (1942). However, only that portion of the package unrelated to the real property is governed by Article Nine when "a promissory note and mortgage together become the subject of a security interest ." *In re Bristol Associates, Inc.*, 505 F.2d

1056, 1061 (3rd Cir.1974). See also *First Nat'l Bank of Boston v. Larson ( In re Kennedy Mortgage Co.)*, 17 Bankr.957, 963-65 (Bankr.D.N.J.1982).

**\*10** As Defendants correctly note, there is no MCL 440.9504(3). MCL 440.9504 contains only 2 subsections:

A financing statement sufficiently indicates the collateral that it covers if the financing statement provides 1 of the following:

(a) A description of the collateral pursuant to section 9108.

(b) An indication that the financing statement covers all assets or all personal property.

MCL 440.9504.

Contrary to Plaintiffs' assertion in the Complaint, this section makes no reference to notice to a debtor.

In their Response, Plaintiffs cite Article Nine of the UCC, MCL 440.9627, as applicable. It says:

(1) The fact that a greater amount could have been obtained by a collection, enforcement, disposition, or acceptance at a different time or in a different method from that selected by the secured party is not of itself sufficient to preclude the secured party from establishing that the collection, enforcement, disposition, or acceptance was made in a commercially reasonable manner.

(2) A disposition of collateral is made in a commercially reasonable manner if the disposition is made in the usual manner on any recognized market, at the price current in any recognized market at the time of the disposition, or otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition.

(3) A collection, enforcement, disposition, or acceptance is commercially reasonable if it has

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5381866 (E.D.Mich.), 67 UCC Rep.Serv.2d 692
**(Cite as: 2008 WL 5381866 (E.D.Mich.))**

been approved in a judicial proceeding, by a bona fide creditors' committee, by a representative of creditors, or by an assignee for the benefit of creditors.

(4) Approval under subsection (3) need not be obtained, and lack of approval does not mean that the collection, enforcement, disposition, or acceptance is not commercially reasonable.

MCL 440.9627.

Plaintiffs' Complaint alleges it would be commercially unreasonable to sell the property at a sheriff's sale for approximately $300,000.00 when the current appraisal is $425,000.00 and Plaintiffs are still willing to pay up to $600,000.00 for the property at a reasonable term and interest rate. However, Article Nine governs secured transactions involving personal property, not sales of foreclosed real property. *See* MCL 444.9109. Therefore, this allegation fails to state a claim under Article Nine of the UCC.

The Court grants Defendants' Motion to Dismiss Count V.

**V. CONCLUSION**

For the reasons stated above, the Court **GRANTS** Defendants' Countrywide Home Loans, Inc., Countrywide Bank, Lucy Chacon, Mark Wilson, and Lee Gonzalez's Motion to Dismiss in its entirety.

**IT IS ORDERED.**

E.D.Mich.,2008.
Munson v. Countrywide Home Loans, Inc.
Not Reported in F.Supp.2d, 2008 WL 5381866 (E.D.Mich.), 67 UCC Rep.Serv.2d 692

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.